1
2
3
4
5
6

KEKER, VAN NEST & PETERS LLP
R. JAMES SLAUGHTER - # 192813
rslaughter@keker.com
ERIC H. MACMICHAEL - # 231697
emacmichael@keker.com
TRAVIS SILVA - # 295856
tsilva@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:      415 397 7188

7
8
9
10
11

VENABLE, LLP
WILLIAM M. SLOAN - # 203583
wmsloan@venable.com
TYLER G. WELTI - # 257993
tgwelti@venable.com
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone:     415.653.3750
Facsimile:      415.653.3755

12

Attorneys for Plaintiff ATHLETICS
INVESTMENT GROUP, LLC

13

UNITED STATES DISTRICT COURT

14

NORTHERN DISTRICT OF CALIFORNIA

15

SAN FRANCISCO DIVISION

16
17
18
19
20
21
22

ATHLETICS INVESTMENT GROUP, LLC,

           Plaintiff,

    v.

SCHNITZER STEEL INDUSTRIES, INC.,

           Defendant.

Case No. 3:21-cv-05246-MMC

**PLAINTIFF'S TRIAL BRIEF**

Dept.:      Courtroom 7 - 19th Floor
Judge:     Hon. Maxine M. Chesney

Date Filed: July 7, 2021
Trial Date: November 12, 2024

23
24
25
26
27
28

2709401

1

# **TABLE OF CONTENTS**

2
**Page**

3    I.    INTRODUCTION ..................................................................................... 1

4    II.   REGULATORY BACKGROUND ............................................................ 2

5    III.  SUMMARY OF KEY FACTS.................................................................. 3

6          A.    Between 2006-2009, Schnitzer installed a new mega-shredder, expanded its operations, and under-reported its emissions. ...................................... 3

7

8          B.    Source testing in 2017 and 2018 confirm the extent of Schnitzer's emissions.................................................................................................... 5

9          C.    Schnitzer concedes that it violated permit conditions in 2021 and 2022 before installing more protective emission controls........................................... 6

10

11         D.    Schnitzer's stockpiles and torch-cutting operations are unpermitted sources. ................................................................................................... 7

12         E.    Schnitzer's evasion of emission controls harmed AIG and human health and the environment in West Oakland. ................................................. 7

13

14   IV.   ANALYSIS OF AIG'S CLAIMS ............................................................ 8

15         A.    Schnitzer violates CAA Title V by operating its Facility without the requisite Title V permit........................................................................... 8

16         B.    Schnitzer violates BACT requirements in operating its mega-shredder. ............ 11

17         C.    Schnitzer violated its permit to operate from 2020 to 2022. ............................ 12

18         D.    Schnitzer's stockpiles and torch-cutting activities are sources or air pollution, which Schnitzer operates without permits and in violation of the CAA.......................................................................................................... 13

19

20               1.    Schnitzer's stockpiles do not qualify for any permitting exemption and do not comply with BACT............................................................. 13

21

22               2.    Schnitzer operates its torches without CAA permits and without complying with BACT............................................................................. 15

23         E.    Schnitzer's defenses are legally irrelevant and factually meritless...................... 16

24         F.    AIG is entitled to its requested remedies. ................................................... 18

25               1.    AIG is entitled to injunctive relief to stop Schnitzer's violations. ........... 18

26               2.    The Court should impose civil penalties for Schnitzer's repeated and serious violations of the CAA........................................................... 19

27

28   V.    CONCLUSION........................................................................................ 20

1
2

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ass'n of Irritated Residents v. Fred Schakel Dairy*,
  No. 05-CV-00707-OWW, 2008 WL 850136 (E.D. Cal. Mar. 28, 2008) .......................... 9, 10

*Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal.*,
  83 F.3d 1111 (9th Cir. 1996)...................................................................................... 12

*Friedman v. EPA*,
  No. 04-0517-WBS, 2005 WL 8176622 (E.D. Cal. Feb. 25, 2005) ........................................ 9

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)..................................................................................................... 18

*Pound v. Airosol Co.*,
  498 F.3d 1089 (10th Cir. 2007) ............................................................................... 9, 10

*U.S. v. J&D Enters. of Duluth*,
  955 F. Supp. 1153 (D. Minn 1997)............................................................................ 9

**Federal Statutes**

42 U.S.C. § 7401(b)(1) ...................................................................................................... 2

42 U.S.C. § 7409 ............................................................................................................... 2

42 U.S.C. § 7410(a)(2)(A) ................................................................................................. 2

42 U.S.C. § 7412 ............................................................................................................... 3

42 U.S.C. § 7413(e)(1) .................................................................................................... 19

42 U.S.C. § 7413(e)(2) .................................................................................................... 19

42 U.S.C. § 7604 ............................................................................................................... 2

42 U.S.C. § 7604(a) ........................................................................................................ 18

42 U.S.C. § 7604(b)(1)(B) ............................................................................................... 13

42 U.S.C. § 7604(f)(4) ............................................................................................... 3, 18

42 U.S.C. § 7604(g)(2) .................................................................................................... 20

42 U.S.C. § 7661a(a) ......................................................................................................... 2

**Regulations**

40 C.F.R. § 52.220...................................................................................................... 2

40 C.F.R. § 70.7(b)...................................................................................................... 2

**Other Authorities**

BAAQMD, Complex Permitting Handbook for BAAQMD New Source Review
    Permitting at 58 (Sept. 2016) ............................................................... 11

Bay Area Air Quality Management District Rule 2-1-115 ...............................13, 14, 15

Bay Area Air Quality Management District Rule 2-1-121 ...................................15, 16

Bay Area Air Quality Management District Rule 2-1-203 ........................................ 10

Bay Area Air Quality Management District Rule 2-1-234 ........................................ 11

Bay Area Air Quality Management District Rule 2-1-301 ........................................ 13

Bay Area Air Quality Management District Rule 2-1-302 ..................................... 3, 13

Bay Area Air Quality Management District Rule 2-1-316 ...............................14, 15, 16

Bay Area Air Quality Management District Rule 2-1-319 ........................................ 14

Bay Area Air Quality Management District Rule 2-1-320 ...............................11, 12, 16

Bay Area Air Quality Management District Rule 2-2-202 ..................................... 3, 11

Bay Area Air Quality Management District Rule 2-2-301 ..................................... 3, 11

Bay Area Air Quality Management District Rule 2-2-604 ........................................ 11

Bay Area Air Quality Management District Rule 2-6-212 ..................................... 3, 10

Bay Area Air Quality Management District Rule 2-6-301 ......................................... 9

Bay Area Air Quality Management District Rule 2-6-307 ......................................... 9

Bay Area Air Quality Management District Rule 2-6-313 ......................................... 2

Bay Area Air Quality Management District Rule 2-6-404 ......................................... 9

Bay Area Air Quality Management District Rule 2-6-409 ......................................... 2

Bay Area Air Quality Management District Rule 6-1-209 ........................................ 13

2709401

1

## I.    INTRODUCTION

Congress enacted the Clean Air Act (CAA) to protect the public and the environment from harmful air pollution. Congress put much of the work of controlling such emissions in the hands of local regulators, but—understanding that these regulators would sometimes fail to uphold this important law—Congress included as a backstop a citizen-suit provision that allows the public to enforce the CAA where local regulators fail to do so. Citizen enforcement is particularly important in neighborhoods, such as West Oakland, that have long been underrepresented and even deliberately deprioritized by regulators.

West Oakland is where Defendant Schnitzer Steel Industries, Inc., (Schnitzer) owns and operates the largest metal shredding facility (Facility) in California. Each year, Schnitzer shreds up to 720,000 tons of cars, appliances, construction materials, and manufacturing waste in its "mega-shredder." The mega-shredder emits many regulated air pollutants, including volatile organic compounds and numerous hazardous air pollutants. Material that is too large to go into the mega-shredder is cut into smaller pieces using torch-cutters and shears. The torches vaporize metal in cutting through thousands of tons of discarded bulk waste, emitting numerous toxic HAPs into the air. Schnitzer also stores materials in towering, multi-story high stockpiles. The stockpiles consist of hazardous materials, and many of Schnitzer's stockpiles are left outside and uncovered. The stockpiles, too, emit regulated air pollutants into the surrounding community.

The evidence will show that Schnitzer's operations—including the mega-shredder, stockpiling, and torch cutting operations—have violated the CAA by emitting harmful regulated air pollutants without required permits and in excess of legally enforceable limitations. While most emissions are invisible to the naked eye, these activities also disperse across West Oakland a substance called light fibrous material, a visible cocktail of harmful air pollutants that regulators have deemed hazardous waste. Schnitzer's pollution harms the community that surrounds the Facility, including Plaintiff Athletics Investment Group (AIG), which maintains its offices directly downwind from the Facility. Indeed, a recent Bay Air Quality Management District (Air District) analysis confirms that from 2009 through 2022, the cancer risk associated with Schnitzer's emissions was nearly ***four times*** higher than currently allowed.

2709401

AIG will prove four claims at trial: (1) Schnitzer operated the Facility for over 15 years without a Title V permit even though the Facility's emissions exceeded Title V thresholds; (2) Schnitzer failed to timely install the requisite emissions control technology to reduce shredder emissions, resulting in over 15 years of excessive air pollution; (3) Schnitzer exceeded emission limits established by its permits to operate; and (4) Schnitzer failed to obtain permits for, and enclose, the Facility's large-scale stockpiles and torch-cutting operations.

Given the comprehensive and long-standing nature of Schnitzer's violations, AIG will ask the Court to impose substantial penalties under the CAA, order a portion of those penalties be directed towards beneficial mitigation projects to reduce past and ongoing harm suffered by AIG and others in West Oakland, and issue injunctive relief designed to bring the Facility into compliance with the law.

AIG looks forward to fully presenting its case to the Court and demonstrating that the evidence compels a judgment in its favor on all four claims.

## II.    REGULATORY BACKGROUND

To ensure public health and welfare, the CAA provides a detailed regulatory scheme for maintaining air quality. 42 U.S.C. § 7401(b)(1). National Ambient Air Quality Standards (NAAQS) set limits for certain air pollutants. *Id*. § 7409. State agencies work with the EPA to develop State Implementation Plans (SIPs), which, among other things, enforce the NAAQS through emissions limits and pollution control measures. *Id*. § 7410(a)(2)(A). Under California's SIP, the Air District is the primary air quality regulator in the Bay Area. EPA-approved SIP provisions, including the Air District's rules, are enforceable through citizen suits. 42 U.S.C. § 7604; 40 C.F.R. § 52.220.

Under the CAA and related regulations, any "major source" of air pollution must obtain a Title V permit to ensure that the polluter complies with regulations via monitoring and reporting. 42 U.S.C. § 7661a(a); 40 C.F.R. § 70.7(b); Rules 2-6-313, 2-6-409.[1] A facility is a "major source" if it "[emits] or has the potential to emit" at least (a) 100 tons per year of any regulated air pollutant, including precursor organic compounds (POCs), (b) 10 tons per year of any hazardous

---

[1] Citations to "Rule" or "Rules" are to the Bay Area Air Quality Management District Rules.

air pollutant (HAP), *or* (c) 25 tons per year of any combination of HAPs. Rule 2-6-212. HAPs are pollutants known or suspected to cause cancer, other serious health effects such as respiratory issues and birth defects, or adverse environmental effects. 42 U.S.C. § 7412.

Facilities must obtain permits to operate new or modified sources of air pollution. Rule 2-1-302. These permits outline conditions for compliance with environmental, health, and safety regulations and must be renewed each year. A permit condition is an "emission standard or limitation" enforceable through a CAA citizen suit. 42 U.S.C. § 7604(f)(4). When emissions surpass certain thresholds, a facility must also install the best available control technology (BACT) to limit emissions. Rule 2-2-202. Any new or modified source that has a potential to emit 10 or more pounds of any BACT pollutant "on any day" must install BACT. Rule 2-2-301.

## III.    SUMMARY OF KEY FACTS

The Court is familiar with the key facts, which AIG summarizes here.

### A.    Between 2006-2009, Schnitzer installed a new mega-shredder, expanded its operations, and under-reported its emissions.

In 2006, Schnitzer applied to the Air District for permission to install a new mega-shredder. The Air District granted permission, and Schnitzer installed the mega-shredder, a multi-story grinding machine that shreds junked products such as cars and appliances. In 2007, Schnitzer applied to increase the annual throughput limit—that is, the annual cap on total tonnage moved through the mega-shredder—from 431,471 to 720,000 tons per year. The Air District granted this second application in 2009.

As a part of its 2006 and 2007 applications, Schnitzer misrepresented its emissions to the Air District. For the 2006 application, Schnitzer provided the Air District with some emission factors[2] from an industry-sponsored report known as the Versar Report—a 1996 report that has since been discredited and is no longer in use—while ignoring other, higher emission factors developed within the industry and even omitting relevant information from the Versar Report in its application. Indeed, the evidence will show that in its 2006 application Schnitzer suggested

---

[2] Emission factors are used to estimate a source's emissions. They can be derived from testing a specific source (source test) or from technical literature.

that the mega-shredder would not emit *any* POCs, despite the Versar Report's recognition that POCs are of course emitted from the mega-shredder and despite other studies showing those emissions to be significant. As a consequence, the District's analysis of the 2006 application assumed that the to-be-installed mega-shredder would have substantially lower emissions than it ultimately did. The Air District nevertheless granted the 2006 application, imposing on Schnitzer the condition that it "shall enclose" the mega-shredder operation.

Then, in 2007, Schnitzer ran a source test at the mega-shredder in an ostensible effort to quantify Schnitzer's emissions. Although the Air District had required Schnitzer to enclose the mega-shredder, the evidence will show that Schnitzer operated the mega-shredder from a skeleton structure with no roof and flaps as walls on only three sides.[3] Notwithstanding this structure's obvious deficiencies— including the fact that Schnitzer essentially operated the


*TX 295, 2014 Presentation*

mega-shredder in the open air with emissions visibly leaving the structure—Schnitzer urged the Air District to assume that the emission abatement device that Schnitzer installed captured a large majority of the mega-shredder's emissions and that no further emissions could be captured. When Schnitzer conducted the 2007 source test, it made no effort to account for any emissions that went uncaptured by this incomplete enclosure, or even to acknowledge to the Air District that the 2007 source test results should be interpreted with caution. The evidence will show that the Air District relied on Schnitzer's underreported results in calculating whether the 2007 application triggered Title V permitting requirements, triggered BACT, and—once the Air District found that BACT was in fact triggered—in analyzing whether Schnitzer must install new emission controls. AIG will show that Schnitzer's limited enclosure unsurprisingly did not capture the large majority of emissions from the mega-shredder, that this fact should have been obvious to Schnitzer at the time, and that the emissions estimates that Schnitzer represented—and the source tests on which

---

[3] *See, e.g.,* TX 295. TX refers to the trial exhibit number for documents the parties will use at trial. Per the pretrial order, the parties will provide these exhibits to the Court on the first day of trial. *See* Dkt. 77, Section E.3.

they were based—were very wrong. In fact, as AIG explains below, emissions estimates performed after the mega-shredder was actually enclosed showed that the mega-shredder required a Title V permit and substantially more protective BACT controls.

**B.     Source testing in 2017 and 2018 confirm the extent of Schnitzer's emissions.**

In 2016, Schnitzer applied for a permit to enclose the mega-shredder[4] and upgrade its abatement system. AIG will show how, in reviewing that application, the Air District acknowledged that Schnitzer had previously not properly accounted for the full extent of the mega-shredder's emissions. The Air District required that, after enclosing the mega-shredder, Schnitzer conduct a series of source tests to more accurately estimate the mega-shredder's emissions. As the evidence will show, the Air District planned to use the new source tests to estimate shredder emissions and establish new emissions rates to determine if Schnitzer had complied with applicable requirements—including BACT—with respect to the new mega-shredder and throughput increase permitted in 2006 and 2009. *See* TX 91.

Subsequent source tests from mid-2017 through January 2018 confirmed that the mega-shredder's potential to emit exceeded Schnitzer's prior representations and was far higher than Title V thresholds. Schnitzer further concedes that, after the 2009 throughput increase, "[t]here were no modifications to the Oakland Facility." In other words, the mega-shredder was operating exactly as it always had, but Schnitzer finally started accurately measuring its emissions starting in 2017. Using the correct emission factors calculated with the 2017/18 source tests, there is no dispute that the mega-shredder's potential to emit POCs and HAPs had exceeded Title V thresholds since 2006. But Schnitzer did not apply for a Title V permit until October 2018, almost 12 years after it began operating as a Title V facility. Schnitzer's efforts to comply with BACT were even more belated. A Schnitzer witness will testify that, although regenerative thermal oxidizers (RTOs) were BACT for POCs since at least 2008, and that a competitor California shredder was then installing an RTO to abate POC emissions, Schnitzer did not even apply for a permit to install its RTOs until 2019 and the RTOs did not become operational until 2022, after

---

[4] The enclosure Schnitzer installed in 2017 did not comply with BACT because it does not meet EPA Method 204, which establishes specifications for total permanent enclosures that ensure a sufficient capture rate for emissions.

the filing of this lawsuit. Even then, complying with BACT requires operating the new enclosure under the EPA's Method 204 protocol, which helps to guarantee emissions are captured, and Schnitzer's witnesses will testify that even today the enclosure is not compliant with that protocol.

Schnitzer now claims that it filed for its Title V permit within a year of learning that the mega-shredder's emissions exceeded Title V thresholds. But, as discussed below, *when* Schnitzer had *actual* knowledge of its true potential emit is irrelevant because the CAA is a strict liability statute. Schnitzer's Title V application was due no later than 2007. Nevertheless, the evidence will show that no later than August 23, 2017, Schnitzer received source test results clearly showing that its emissions exceeded Title V thresholds and therefore it needed to file for a Title V permit, but that it still failed to do so until almost 14 months later—October 15, 2018. Under any scenario, Schnitzer's Title V application was untimely.

### C.    Schnitzer concedes that it violated permit conditions in 2021 and 2022 before installing more protective emission controls.

After Schnitzer ran the 2017/18 source tests, the Air District began imposing additional conditions on Schnitzer's permit to operate, which eventually resulted in Schnitzer installing RTOs. In 2021 and 2022, the Air District imposed hourly and yearly emissions limits for the mega-shredder's POC and particulate matter (PM) limits. *See, e.g.*, TX 31, TX 102. Schnitzer has stipulated to violating these emission limits through 2022.[5]

In April 2022, Schnitzer finally installed RTOs at the mega-shredder to control POC emissions. AIG's experts will testify that the Air District's BACT requirement compelled Schnitzer to install RTOs in 2006, when Schnitzer first triggered BACT for the mega-shredder. But as Schnitzer's own witnesses will admit at trial, even after installing RTOs, Schnitzer has continued violating permit conditions and Air District rules in operating its mega-shredder and other sources at the Facility at issue in this case. In fact, the Air District just announced in October 2024 that Schnitzer would pay a $575,000 fine to resolve seven notices of violation, all

---

[5] *See* Dkt. 177 ("Joint Pretrial Statement") at 7 (Stipulated Fact 17 states that "[b]etween November 1, 2020, and April 2022, the mega-shredder's daily POC emissions exceeded the Condition #27085 limitations"); *see also id.* at 2 (similar).

PLAINTIFF'S TRIAL BRIEF
Case No. 3:21-cv-05246-MMC

2709401

of which were issued *after* AIG filed this lawsuit and *after* Schnitzer installed RTOs.

**D.    Schnitzer's stockpiles and torch-cutting operations are unpermitted sources.**

Schnitzer maintains two emissions sources which, indisputably, lack permits. Schnitzer uses outdoor, uncovered stockpiles between 30-40 feet high to store post-processing metal shredder aggregate and other materials. The stockpiles emit POCs, PM, and HAPs, all of which are regulated air pollutants. The stockpiles have caught on fire multiple times, releasing toxic fumes and further pollutants into the air. Schnitzer also conducts large-scale torch-cutting operations, cutting thousands and thousands of tons of bulk metal per year into smaller pieces. This process emits CAA regulated pollutants into the air and surrounding community. Schnitzer recently expanded its torch-cutting operating schedule significantly, which would increase the annual potential to emit significantly more than the emission estimates that Schnitzer provided to the Air District for its health-risk analyses.

Schnitzer has long evaded permitting requirements for these sources. The Air District's witness has testified that she previously had assumed that the Air District issued exemptions for these sources. That assumption is contradicted by the documentary record and the Air District reluctantly will testify that, in fact, no such exemption has ever been issued. Indeed, the evidence will show that the Air District instructed Schnitzer to apply for a permit to operate the stockpiles in 2019, but Schnitzer has not done so. More recently, in 2022 (after AIG filed this lawsuit), the Air District began a formal process for evaluating whether the stockpiles and torches are exempt from permitting requirements. *See, e.g.*, TX 333. The Air District has not completed this analysis, or offered any reason for why, two years later, it has made no progress on it. In the meantime, Schnitzer has continued operating these sources with no permit, no enforceable limitations, and no exemption. The Court does not need to decide the reason for the Air District's unexplained failure to diligently regulate the Facility because the CAA's strict liability provisions require AIG show only a violation of the Act, which the evidence will show.

**E.    Schnitzer's evasion of emission controls harmed AIG and human health and the environment in West Oakland.**

Schnitzer's pollution harms West Oakland. In 2019, the Air District completed a

---

PLAINTIFF'S TRIAL BRIEF
Case No. 3:21-cv-05246-MMC

2709401

community-wide health assessment. It found that Schnitzer emits significantly more pollution and causes significantly greater cancer risk than any other stationary source in West Oakland. A recent Air District analysis confirms that from 2009 through 2022 the cancer risk associated with shredder emissions was nearly **four times** higher than what is allowed under the Air District's ordinary permitting rules. *See* TX VVVV.

Moreover, Schnitzer emits light fibrous material (LFM)—a cocktail of air pollutants regulated by the CAA—from its stockpiles and other sources at the Facility. In addition to containing air pollutants that the CAA regulates, Schnitzer's LFM is hazardous waste under California law. To this day, the Department of Toxic Substances Control and other regulators require Schnitzer to send clean-up crews into West Oakland to collect the LFM emitted from the Facility and dispose of it as hazardous waste.

Schnitzer's Facility is located within one mile of AIG's offices at 55 Harrison Street in Oakland (and its parking structure at 255 Second Street) and even closer to another building operated by AIG at 10 Clay Street. AIG's experts will explain that the health risk at these locations is elevated because of Schnitzer's pollution. AIG's experts will also testify that Schnitzer's LFM is physically present at both locations.

## IV.    ANALYSIS OF AIG'S CLAIMS

AIG will prove four claims at trial: (1) Schnitzer operated the Facility for over 15 years without a Title V permit even though the Facility's emissions exceeded Title V thresholds; (2) Schnitzer failed to install the requisite Best Available Control Technology for the mega-shredder; (3) Schnitzer exceeded emission limits established by its permits to operate; and (4) Schnitzer failed to obtain the requisite permits or install the appropriate BACT for the Facility's stockpiles and torch-cutting operations.

### A.    Schnitzer violates CAA Title V by operating its Facility without the requisite Title V permit.

A facility violates Title V of the Clean Air Act if: (1) it has a "potential to emit" at least (a) 25 tons per year of a combination of HAPs, (b) 10 tons per year of any individual HAP, or (c) 100 tons per year of any regulated air pollutant (including POCs); and (2) it fails to apply for a

Title V permit within twelve months of becoming a major facility. Rules 2-6-301, 2-6-404. A major facility that does not submit a timely and complete permit application within twelve months of becoming a major facility "is in violation of the Clean Air Act[,] shall be subject to enforcement action . . . and shall not operate." Rule 2-6-307. "The [Clean Air] Act imposes strict liability upon owners and operators who violate the Act." *Pound v. Airosol Co*., 498 F.3d 1089, 1097 (10th Cir. 2007); *see also Ass'n of Irritated Residents v. Fred Schakel Dairy*, No. 05-CV-00707-OWW, 2008 WL 850136 at *15 (E.D. Cal. Mar. 28, 2008) ("[T]he CAA is a strict liability statute making Defendants' knowledge or intent . . . irrelevant for liability purposes."); *Friedman v. EPA*, No. 04-0517-WBS, 2005 WL 8176622 at *8 (E.D. Cal. Feb. 25, 2005) (same).[6]

Schnitzer has been a "major facility" subject to Title V and federally enforceable Air District rules since at least 2006. Thus, from November 2007—a year from when Schnitzer installed its new mega-shredder—until at least April 2022, when Schnitzer installed RTOs, Schnitzer exceeded thresholds set by Title V of the CAA and Air District Regulation 2, Rule 6. The Title V threshold for total POCs is 100 tons per year. AIG's experts will testify that from 2006 to 2009, the Facility had the potential to emit 106 tons of POCs per year and that from 2009 to 2022, the Facility had the potential to emit at least 177 tons of POCs per year, almost double the Title V threshold. Further, the threshold for any combination of HAPs is 25 tons per year; Schnitzer's potential to emit total HAPs was over 26.1 tons per year from 2006 to 2009 and over 43 tons per year from 2009 to 2022. And the Title V threshold for any individual HAP is 10 tons per year. Schnitzer's Facility had the potential to emit 12 tons per years of the HAP xylene from 2009 to 2022. Indeed, Schnitzer will concede that its emissions exceeded Title V thresholds as of 2017 and therefore—because there had been no changes to the mega-shredder since 2009—it had exceeded Title V threshold since at least that date.

---

[6] Congress specifically intended the CAA to be a strict liability statute. "[W]here protection of the public health is the root purpose of a regulatory scheme (such as the Clean Air Act), ***persons who own or operate pollution sources in violation of such health regulations must be held strictly accountable*** . . . . ***Any other rule would make it in the owner or operator's interest not to have actual knowledge of the manner of operation of the source***. . . . [T]he public health is injured just as much by a violation due to negligence or inaction as it is by a violation due to intent to circumvent the law." *U.S. v. J&D Enters. of Duluth,* 955 F. Supp. 1153, 1158 (D. Minn 1997) (citing H.R. Rep. No. 94-1175, 9th Cong., 2d Sess. at 52 (1976)) (emphasis added).

1    Schnitzer tries to justify its severely understated emissions by asserting that it did not

2    know its true emissions before 2017. That is irrelevant. Because the CAA is a strict liability

3    statute, Schnitzer's knowledge—or purported lack of knowledge—is irrelevant to its liability.

4    *Pound*, 498 F.3d at 1097; *Ass'n of Irritated Residents*, 2008 WL 850136 at *15; *supra*, n.6.

5    But even if Schnitzer's knowledge of its emissions were somehow relevant, the evidence

6    will show that, since 2006, Schnitzer should have known its emissions exceeded Title V

7    thresholds because it had been misrepresenting its true emissions. Schnitzer unreasonably told the

8    Air District when applying to build the mega-shredder in 2006 that the mega-shredder would not

9    emit any POCs, and it suggested that source tests done after the mega-shredder began operating in

10   a skeleton structure with no roof or any walls captured most of the emissions capable of capture.

11   Thus, even if Schnitzer's knowledge of its emissions were relevant—and as a matter of law, it is

12   not—Schnitzer should have known that its emissions exceed Title V thresholds.

13   Schnitzer also hides behind its effort to classify most of its pre-2017 emissions as

14   "fugitive." This is a red herring. To start, fugitive HAPs—the subset of particularly harmful,

15   carcinogenic pollutants regulated under the CAA—must be accounted for when considering Title

16   V thresholds, regardless of whether they are fugitive or not. Rule 2-6-212. There is no dispute that

17   the 2017/18 source tests showed that the mega-shredder emitted HAPs over the thresholds, and

18   Schnitzer concedes that the 2017/18 source test results reflect emissions for the 2009-2017

19   period.[7] It is thus irrelevant whether some portion of those HAPs emissions could be considered

20   fugitive.

21   Moreover, Schnitzer's suggestion that most of its 2006-2017 POC emissions were

22   "fugitive" is wrong. Fugitive emissions are those "which could not reasonably pass through a

23   stack, chimney, vent, or other functionally equivalent opening." Rule 2-1-203. Between 2006 and

24   2017, the mega-shredder's POCs could "reasonably pass through a stack." This capability is made

25   clear by the fact that these POC emissions were *actually* made to pass through a stack in 2017,

26   when Schnitzer enclosed the mega-shredder, using basic technology that has existed for decades.

27   Schnitzer and the Air District will both testify that it was technologically and economically

28   _____

[7] AIG also contends that emissions exceeded the HAPs threshold in the 2006-2009 period.

PLAINTIFF'S TRIAL BRIEF
Case No. 3:21-cv-05246-MMC

2709401

1    feasible to enclose the mega-shredder and capture these emissions in 2006.

2        The facts with respect to Schnitzer's emissions are not reasonably in dispute. The question

3    for the Court will be whether Schnitzer's legal arguments regarding its lack of knowledge or with

4    respect to so-called fugitive emissions hold water. They don't. The Court should enter judgment

5    for AIG on its first claim.

6        **B.    Schnitzer violates BACT requirements in operating its mega-shredder.**

7        The Air District's BACT rules apply to any new or modified sources with a potential to

8    emit more than 10.0 pounds a day of certain pollutants, which include POCs. Rule 2-2-301.

9    BACT is the most stringent "emission limitation, control device, or control technique" that either

10   (i) has been achieved in practice on another source of the same type or (ii) is technologically

11   feasible and cost-effective to use, even if it has not been used with another similar source. Rule 2-

12   2-202.[8] If an existing source is modified, it becomes subject to BACT requirements if a "physical

13   change, change in method of operation, change in throughput or production, or other similar

14   change" increases the source's potential to emit relative to baseline emissions. Rules 2-2-301.2,

15   2-2-604, 2-1-234. The "owner and operator of a source of air pollutant emissions shall construct

16   and operate the source in conformance with any representations made or information submitted to

17   the APCO in connection with the application for such authority to construct and/or permit to

18   operate." Rule 2-1-320.

19       Schnitzer triggered BACT for POC emissions when it installed the mega-shredder in

20   2006, when it increased throughput in 2009, and when it enclosed the mega-shredder in 2017.

21   During the 2006-09 period and still today, BACT for POC emissions requires permanent total

22   enclosure, operation of RTOs, and compliance with EPA Method 204. Schnitzer did not install

23   RTOs until 2022 and while Schnitzer improved the enclosure in 2017, it still is not in compliance

24   with Method 204 today.

25       While, again, Schnitzer's state of mind is irrelevant in this strict liability case, the

26   evidence will show that during the 2006-2009 period Schnitzer should have known that the Air

27
---
28   [8] *See also* BAAQMD, Complex Permitting Handbook for BAAQMD New Source Review
     Permitting at 58 (Sept. 2016), https://www.baaqmd.gov/~/media/files/permits/permitting-
     manuals/nsr-guidance/complex-nsr-permitting-handbook_sept-2016-pdf.pdf

District's BACT requirements compelled total enclosure of the mega-shredder and installation of RTOs. The evidence will show that nothing prevented Schnitzer from installing a Method 204-compliant enclosure when it installed the mega-shredder in 2006 or at any point since. Schnitzer's witnesses will testify that Schnitzer was aware as early as 2008 that a California metal shredder was installing an RTO. Other shredders, including one owned by Schnitzer in Massachusetts, have been required to install such enclosures. Furthermore, as AIG shows above, Schnitzer's representations about its HAPs and POC emissions during the 2006-2009 permitting period, which are representations the Air District relied upon when it conducted its BACT analysis, were false and thus cannot excuse AIG's failure to comply with BACT. Rule 2-1-320.

### C.    Schnitzer violated its permit to operate from 2020 to 2022.

Since 2020, Schnitzer's permit to operate has imposed, among other emissions limits, (1) a maximum permitted emission rate for POCs (112.0 pounds per hour and 85.50 tons per year) and (2) a total carbon limit. Schnitzer has **stipulated** that it exceeded the hourly and annual POC emissions limits set forth in its 2020-2021 and 2021-2022 Permits to Operate.[9]

Despite acknowledging its non-compliance, Schnitzer claims the exceedances were permitted by a Compliance and Settlement Agreement signed with the Air District in 2020. But the Agreement only addressed Schnitzer's violation of total carbon limits, violations which are not at issue in this case. The Agreement did not touch or amend the POC emission limits in the permits at issue here. In fact, after the Agreement was entered into in September 2020, the Air District subsequently imposed POC emission limits that Schnitzer *again* violated. *See* Joint Pretrial Statement at 7 (Stip. Fact 18).

The Agreement also cannot bar this suit because it did not and could not modify Schnitzer's permits. *See, e.g.*, *Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal.*, 83 F.3d 1111, 1118-20 (9th Cir. 1996) (holding that an agency agreement to extend a deadline that did not follow "federal and state regulations govern[ing] the modification of [] permits" and did not modify a Clean Water Act permit). Further, this Agreement was also not approved by a court nor

---

[9] Joint Pretrial Statement at 7 (Stip. Fact 17 states that "Between November 1, 2020, and April 2022, the mega-shredder's daily POC emissions exceeded the Condition #27085 limitations").

made subject to public review and comment. CAA citizen suits are only barred when agencies diligently prosecute violations "in a court," but the Compliance and Settlement Agreement was entered into out of court. *See* 42 U.S.C. § 7604(b)(1)(B). Schnitzer cannot avoid accountability by pointing to a backroom agreement that settled violations of a different rule and could not and, in fact, did not change the enforceable POC emissions limits in the Facility's permit.[10]

### D.    Schnitzer's stockpiles and torch-cutting activities are sources or air pollution, which Schnitzer operates without permits and in violation of the CAA.

#### 1.    Schnitzer's stockpiles do not qualify for any permitting exemption and do not comply with BACT.

Schnitzer must obtain a permit to maintain the stockpiles if they are (1) sources of air pollutants and (2) not exempt from permitting. *See* Rules 2-1-301, 2-1-302. Schnitzer has stipulated that its stockpiles are "sources of emissions of air pollutants." Joint Pretrial Statement at 7 (Stip. Fact No. 20). The only question for trial, therefore, is whether some rule exempts the stockpiles from permitting requirements. The law and evidence will show that the stockpiles are not exempt, must be permitted, and must be enclosed.

Schnitzer argues that the stockpiles are exempt as a "storage" system under Rule 2-1-115.1.4. Schnitzer's stockpiles do not qualify for this exemption for several, independent reasons. ***First***, Rule 2-1-115's application is limited to "potential PM2.5 and PM10 sources." This language must be construed to exclude sources that emit PM and other pollutants—on its face it applies to "PM only" sources. There is no dispute that the stockpiles of hazardous materials emit regulated air pollutants other than PM, including POCs, lead, and numerous HAPs, and so the exception does not apply. ***Second***, the exemption's plain language does not cover stockpiles. Despite exempting "storage silos" and "storage or weigh hopper/bin system[s]" that meet the remaining criteria, the Air District *omits* stockpiles from exemption. The Air District's omission of stockpiles from the list is intentional, given that stockpile is a defined term in District rules.[11]

---

[10] The Court denied the parties' cross-motions for summary judgment on AIG's third claim, stating that there was a triable issue as to whether Schnitzer would engage in the alleged conduct again, noting that just because Schnitzer "avoided enforcement" does not prevent AIG from bringing suit. *See* Mot. for Summ. J. Hearing Tr. at 60-63. AIG believes the merits of Schnitzer's arguments regard the Agreement are no longer at issue in this case.

[11] *See* Rule 6-1-209 (defining "stockpile").

PLAINTIFF'S TRIAL BRIEF
Case No. 3:21-cv-05246-MMC

2709401

1   Further, the Air District's practice is consistent with AIG's construction of the Rule. AIG's

2   experts will testify that the Air District requires permits for stockpiles at other facilities and that

3   the Air District has determined that Rule 2-1-115's exemption does not cover stockpiles. The

4   phrase "storage or weigh hopper/bin system" should be read in the context of other listed terms to

5   only include enclosed, containerized systems—unlikely to emit significant pollutants—which

6   unenclosed, towering stockpiles are definitively not. Schnitzer's reading of Rule 2-1-115.1.4.5 to

7   include all "storage . . . systems" rather than specifically storage hopper/bin systems and weigh

8   hopper/bin systems would also render Rule 2-1-115.1.4.4's exemption of "storage silos" entirely

9   superfluous, and thus must be rejected. Indeed, there would be no need to mention hoppers and

10  bins if the Rule applies to all storage systems as Schnitzer contends, even sprawling, uncontained,

11  outdoor stockpiles like those at the Facility.

12      ***Third***, the stockpiles do not process "exclusively" material with a 5% or greater moisture

13  content. As Schnitzer's own documents will show, the sampling data collected by Schnitzer from

14  2015-2022 shows that the stockpiles contained less than 5% moisture content on numerous

15  occasions. Schnitzer's expert, Mr. Rubenstein, already concedes that when Schnitzer waters its

16  stockpiles, the water does not permeate to the center of the piles, allowing the stockpiles to catch

17  fire. Thus, as a factual matter, Schnitzer's stockpiles fail to meet the 5% moisture content

18  threshold.

19      ***Fourth***, even if the Rule 2-1-115 exemption could be applied to the stockpiles in theory—

20  which it cannot—Rule 2-1-316 prohibits its application to Schnitzer's stockpiles of toxic

21  materials. A source cannot receive a Rule 2-1-115 exemption if it emits toxic air contaminants

22  (TACs) that exceed health-risk thresholds. *See* Rule 2-1-115 (noting Rule 2-1-319 exception to

23  exemption); Rule 2-1-319 (referencing Rule 2-1-316); Rule 2-1-316. As Rule 2-1-316's health-

24  risk thresholds suggest, TACs are ***so harmful*** that permitting exemptions no longer apply when

25  TACs reach certain concentrations. AIG's experts will explain at trial that health-risk assessments

26  show that Schnitzer's stockpiles emit TACs far above these applicable thresholds, meaning

27  Schnitzer must receive permits to operate them. Schnitzer will not be able to provide any health

28  risk assessment to the contrary.

1    Schnitzer has repeatedly argued that the Air District purportedly supports Schnitzer's

2    unpermitted stockpiling operations. That is false. Schnitzer cannot produce any written

3    determination from the Air District stating that the stockpiles have been exempted from

4    permitting requirements. When the Air District asked Schnitzer to apply for permits or provide

5    evidence of an exemption, Schnitzer failed to do so. After AIG filed this litigation, the Air

6    District belatedly began to analyze whether Schnitzer's stockpiles and torch cutting operations are

7    exempt from permitting. The Air District's analysis has been ongoing for two years and is still not

8    complete and the Air District's representative will testify that there is no anticipated date of

9    completion. And contrary to Schnitzer's arguments, the Air District's draft analysis states that the

10   exemption Schnitzer relies on does <u>not</u> apply to stockpiles.[12]

11   Once permitted, Schnitzer's stockpiles will trigger the need to install BACT. AIG's

12   experts will testify that BACT for stockpiles requires enclosure and venting emissions to a

13   baghouse. Schnitzer does not seriously contest this point. Indeed, although Schnitzer appears to

14   contest feasibility here, its witnesses will testify that Schnitzer has suggested to regulators that

15   enclosing stockpiles is actually feasible and, in fact, Schnitzer maintains some stockpiles that are

16   enclosed and vented to a baghouse. There is no technical reason why it cannot do the same for its

17   remaining stockpiles.

18
19               **2.    Schnitzer operates its torches without CAA permits and without complying with BACT.**

20   Schnitzer's torches cut through large chunks of metal. The torching process is done in the

21   open air and emits regulated air pollutants into the surrounding community. Schnitzer agrees that

22   its torches are emissions sources that would ordinarily require permitting, *see* Joint Pretrial

23   Statement at 7 (Stip. Fact. 21), and AIG agrees that—unless an exception applies—Rule 2-1-121

24   exempts the torches from permitting. But Rule 2-1-121 *does* have an applicable exception—the

25   same Rule 2-1-316 TACs exception at issue in the stockpile claim—and that exception precludes

26

27   ─────────────────────
     [12] The Air District's draft analysis suggests a different exemption than the one cited by Schnitzer,
28   but, among other defects with the Air District's draft analysis, that exemption applies only to
     "equipment," and stockpiles are not equipment. As AIG's expert will explain, the Air District has
     also stated for other facilities that the Rule 2-1-115.4 exemption does not apply to stockpiles.

PLAINTIFF'S TRIAL BRIEF
Case No. 3:21-cv-05246-MMC

2709401

1    applying Rule 2-1-121 to Schnitzer's torches.

2         The Rule 2-1-316 exemption precludes a permitting exception where the cancer risk

3    exceeds 1.0 per million, unless the source applies TBACT. This leaves two factual issues for the

4    Court to resolve. First, AIG's experts will testify that the cancer risk posed by the torches

5    substantially exceeds 1.0 per million; indeed, it is closer to 100 than to 1.0. Moreover, since the

6    experts submitted their reports and were deposed, Schnitzer announced that it will increase its

7    torch-cutting operation, meaning that its emissions will be even higher than what AIG's experts

8    previously calculated. Schnitzer does not have an expert to rebut any of these opinions. Second,

9    AIG's expert will testify that TBACT for the torches requires enclosure and venting to a

10   baghouse. Other, similarly situated facilities have adopted this emission control, and Schnitzer's

11   witnesses can offer no explanation for Schnitzer's failure to do so.

12        **E.    Schnitzer's defenses are legally irrelevant and factually meritless.**

13        AIG will prevail on its claims at trial. Schnitzer's primary factual defenses appear to be

14   (1) it didn't know about its own pollution, but once it was forced to learn—over a decade later—it

15   started taking limited steps to comply with the law, and (2) the Air District did not raise concerns

16   that Schnitzer was polluting West Oakland in violation of the CAA. These defenses are meritless.

17        Schnitzer's "we didn't know" defense fails because, if that were the law, countless

18   polluters around the country would be incentivized to willfully ignore how bad their operations

19   are. That is not the law—indeed, Congress recognized this very point when it made the CAA a

20   strict liability statute. *Supra*, n.6. As discussed above, a violation of the CAA is strict liability—

21   ignorance (willful or otherwise) is not a defense.

22        As for the "the Air District let us do it" defense, that too is meritless. Discovery has shown

23   that the Air District relied on the flawed information provided by Schnitzer. Any "approval" of

24   Schnitzer's conduct by the Air District was on the presumption that the information was

25   accurate—but it was not, and the Air District's rules expressly contemplate that its determinations

26   do not protect a facility from liability if it does not construct and operate a source in conformance

27   with prior material assumptions. Rule 2-1-320. Schnitzer also at times seems to assert that the

28   lack of enforcement by the Air District amounted to its conduct being permissible. That notion

PLAINTIFF'S TRIAL BRIEF
Case No. 3:21-cv-05246-MMC
2709401

1    entirely misinterprets the role of CAA citizen-suit cases. In *every* CAA citizen suit, an

2    environmental regulator has failed to do its job. This case is no different. Indeed, the CAA

3    citizen-suit provision exists precisely so that a lawsuit such as this may be brought when an

4    agency has not adequately implemented and enforced the CAA.

5         Schnitzer also advances a series of hyper-technical defenses that, if taken to their logical

6    extension, would gut the CAA citizen-suit provision. First, Schnitzer argues that because AIG is

7    an employer and corporate entity, it cannot sue, even though AIG has evidence that Schnitzer's

8    emissions physically land on AIG's leasehold and are present in unsafe concentrations in the air

9    throughout West Oakland (concentrations that decrease the air quality at AIG's two West

10   Oakland locations). Standing is a low bar in CAA suits. AIG can demonstrate standing simply by

11   showing a likelihood of harm to a legally cognizable interest that is fairly traceable to the alleged

12   misconduct. AIG meets this bar by showing, first, that there is a credible threat of risk that

13   Schnitzer's pollution is physically present at 55 Harrison Street, 255 Second Street, and 10 Clay

14   Street (indeed, Schnitzer's pollution is ***actually*** on the premises in the form of LFM and is

15   contributing to air pollution); second, that AIG has incurred the costs and burden of investigating

16   and monitoring Schnitzer's pollution on its property; and, third, that AIG's on-site employees

17   have an increased risk of suffering harmful health effects because of Schnitzer's pollution, which

18   undermines AIG's business operations and interest in maintaining a safe and healthy workplace.

19        Schnitzer tries to leverage mootness and statute-of-limitations rules to get immunity for its

20   conduct, essentially saying that because it has failed to comply with the CAA for so long, citizens

21   can no longer sue. These standards are not supported by law. As the Court recognized at the

22   summary-judgment stage, for ongoing violations of the CAA, the limitation period resets each

23   day a violation occurs.[13] Schnitzer's violations of Title V and BACT requirements were ongoing

24   when AIG filed suit in 2021, meaning AIG's suit was timely. Any contrary argument would allow

25   polluters to evade the CAA in perpetuity.

26        Schnitzer's mootness argument runs into an extremely high burden that it cannot meet. "A

27   

28   
___

[13] *E.g.*, Mot. for Summ. J. Hearing Tr. at 33-34 (for AIG's first claim "the plaintiff has the better position on the statute here" that "accrual [of the claim] is each day").

case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). It is far from "absolutely clear" that Schnitzer— which bears the burden of establishing mootness—can establish that its "wrongful behavior could not reasonably be expected to recur." *Id.* Since AIG filed this suit, Schnitzer has:

- Continued to operate the mega-shredder, even though the Air District still has not issued a Title V permit or the alternative synthetic minor operating permit that Schnitzer now contends it is entitled to receive. Even today, years into litigation, the mega-shredder is operating without a proper permit.

- Had fires at the Facility, for which Schnitzer received Notices of Violation from multiple regulators, including the Air District.

- Received multiple Notices of Violation from the Air District about Schnitzer's failure to operate its RTOs in conformance with District's rules. In fact, about a month before the November 12 trial date, the Air District announced that Schnitzer would pay a $575,000 to resolve *seven* notices of violation all issued after AIG filed this lawsuit.

Schnitzer carries a heavy burden to establish mootness, and it cannot meet that burden in light of its continued failure to adhere to environmental regulations.

### F.    AIG is entitled to its requested remedies.

AIG seeks all of the relief it is entitled to under the law, including injunctive relief; penalties for Schnitzer's past violations; court-ordered "beneficial mitigation projects" that will help reduce past and ongoing harm to AIG and others in West Oakland; and attorney fees.

### 1.    AIG is entitled to injunctive relief to stop Schnitzer's violations.

The CAA authorizes the Court to enjoin Schnitzer to adhere to any applicable "emission standard or limitation." 42 U.S.C. § 7604(a). An "emission standard or limitation" includes any "standard, limitation, or schedule established" in a Title V permit or applicable State Implementation Plan, and any requirement to obtain a permit. *See id.* § 7604(f)(4). AIG seeks injunctive relief with regard to the following Schnitzer operations.

***First***, Schnitzer has operated its Facility without a required Title V permit since it became

1    subject to Title V on November 1, 2006. Schnitzer also failed to apply timely for a Title V permit
2    by not submitting an application until October 15, 2018, almost twelve years later. The Court
3    should enjoin Schnitzer from operating the Facility until it obtains either a Title V permit or a
4    synthetic minor operating permit and adheres to all operating conditions specified in that permit.

5        *Second*, Schnitzer has operated and continues to operate its mega-shredder without
6    installing BACT, in violation of Air District rules. BACT for the mega-shredder includes an
7    enclosure that complies with EPA Method 204. AIG asks the Court to order Schnitzer to operate
8    its enclosure at the mega-shredder, with RTOs, and in compliance with EPA Method 204.

9        *Third*, Schnitzer has operated and continues to operate stockpiles and torch-cutting
10   operations without a permit to operate and without installing BACT. At a minimum, BACT for
11   each of these sources is enclosure and venting emissions to a baghouse. The Court should order
12   Schnitzer to cease operating these sources until it receives a permit and that the Court require
13   Schnitzer to enclose these sources and vent their emissions to a baghouse.

14
15       **2.    The Court should impose civil penalties for Schnitzer's repeated and
         serious violations of the CAA.**

16       In assessing civil penalties, the Court "shall" consider the following factors: "the size of
17   the business, the economic impact of the penalty on the business, the violator's full compliance
18   history and good faith efforts to comply, the duration of the violation as established by any
19   credible evidence (including evidence other than the applicable test method), payment by the
20   violator of penalties previously assessed for the same violation, the economic benefit of
21   noncompliance, and the seriousness of the violation." 42 U.S.C. § 7413(e)(1). The Court shall
22   also consider "such other factors as justice may require." *Id*. "A penalty may be assessed for each
23   day of violation." *Id.* at § 7413(e)(2).

24       These factors militate in favor of the Court imposing the $182,950,000 in civil penalties
25   that AIG seeks. Schnitzer is a multi-national business that has earned billions in revenues over the
26   relevant time period and has the ability to pay the penalty. Schnitzer's long history of non-
27   compliance is clear and cuts in favor of sizeable penalties. The duration of the violations at issue
28   is lengthy; the mega-shredder, stockpiles, and torches have all operated without permits and

1    without BACT since 2006. AIG's expert will testify that under the EPA's guidelines for civil

2    enforcement settlements brought under the CAA, the value of Schnitzer's noncompliance is high:

3    at least $182 million. And the gravity of Schnitzer's violations is very serious: Schnitzer has

4    emitted toxic, carcinogenic substances such as benzene, polychlorinated biphenyls, lead,

5    cadmium, and hexavalent chromium into a designated environmental justice community in

6    violation of the CAA for more than a decade. AIG's expert was involved in developing EPA's

7    guidelines for the amount of civil penalties that should be part of any civil enforcement settlement

8    brought by the EPA, and he will testify that under that policy—which is about *settlements*, not

9    penalties enforced through litigation—EPA would settle this case for **upwards** of $182,950,000.

10       Schnitzer's willfulness (or even chronic negligence), if found by the Court, also weighs in

11   favor of substantial penalties. The duration of Schnitzer's violations highlights Schnitzer's history

12   of under-reporting emissions to the Air District, continued failures to correct violations, a long

13   history of noncompliance, and constant delays in compliance. Schnitzer knew or should have

14   known that it was underreporting emissions of POCs and HAPs for over a decade before it

15   applied for a Title V permit. Schnitzer also knew or should have known for many years that POC

16   emissions exceeded BACT thresholds, yet it failed to install BACT. Schnitzer was also aware that

17   other shredders enclose their stockpiles and torches but chose not to do the same. The facts also

18   show that Schnitzer gamed source tests to manipulate emissions estimates downward, including

19   by using select feedstock and potable water during source testing, which it knew did not reflect

20   standard operating conditions. The penalties that AIG seeks are more than warranted.

21       The Court should direct that a portion of the civil penalties should be directed to

22   "beneficial mitigation projects" that will "enhance the public health or the environment," as

23   authorized by the CAA. 42 U.S.C. § 7604(g)(2). To cite two obvious examples, such projects may

24   relate to additional LFM clean-up or installation of specialized air filters tailored to abate the

25   specific types of emissions stemming from the Facility.[14]

26   **V.    CONCLUSION**

27       For the foregoing reasons and more to be shown at trial, AIG will prove its claims.

28   _____
     [14] When AIG prevails at trial, it will also be entitled to recover its attorneys' fees.

1    Dated:  October 25, 2024                           KEKER, VAN NEST & PETERS LLP

2

3                                                By:    */s/ R. James Slaughter*

4                                                       R. JAMES SLAUGHTER
                                                        ERIC H. MACMICHAEL
                                                        TRAVIS SILVA

5
                                                        Attorneys for Plaintiff ATHLETICS
6                                                       INVESTMENT GROUP, LLC

7    Dated:  October 25, 2024                           VENABLE LLP

8

9                                                By:    */s/ William M. Sloan*

                                                        WILLIAM M. SLOAN
10                                                      TYLER G. WELTI

11                                                      Attorneys for Plaintiff ATHLETICS
                                                        INVESTMENT GROUP, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2709401

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONCURRENCE

I, R. James Slaughter, am the user whose ID and password are being used to file this Plaintiff's Trial Brief. I hereby attest that William M. Sloan has concurred in this filing.

Dated:  October 25, 2024                    */s/ R. James Slaughter*
                                            R. JAMES SLAUGHTER

PLAINTIFF'S TRIAL BRIEF
Case No. 3:21-cv-05246-MMC

2709401