1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   RONALD E. VAN BUSKIRK (SBN 64683)
2  ronald.vanbuskirk@pillsburylaw.com
   MARGARET ROSEGAY (SBN 96963)
3  margaret.rosegay@pillsburylaw.com
   AARON S. DYER (SBN 161798)
4  aaron.dyer@pillsburylaw.com
   ANDREW D. LANPHERE (SBN 191479)
5  andrew.lanphere@pillsburylaw.com
   STACEY C. WRIGHT (SBN 233414)
6  stacey.wright@pillsburylaw.com
   Four Embarcadero Center, 22nd Floor
7  San Francisco, CA 94111-5998
   Telephone:      415.983.1000
8  Facsimile:      415.983.1200

9  Attorneys for Defendant
   Schnitzer Steel Industries, Inc.

10

11

12

13                    **UNITED STATES DISTRICT COURT**

14                   **NORTHERN DISTRICT OF CALIFORNIA**

15                      **SAN FRANCISCO DIVISION**

16  ATHLETICS INVESTMENT GROUP LLC           | Case No. 3:21-CV-05246-MMC

17              Plaintiff,                    | **DEFENDANT SCHNITZER STEEL**
                                              | **INDUSTRIES, INC.'S TRIAL BRIEF**
18         vs.
                                             | Judge:  Hon. Maxine M. Chesney
19  SCHNITZER STEEL INDUSTRIES, INC.
                                             | Action filed: July 7, 2021
20              Defendant.                    | Trial Date:    November 12, 2024

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION. ..................................................................................................1

II.    SUMMARY. .........................................................................................................1

III.   THERE IS NO TITLE V VIOLATION FOR POCS OR HAPS. ......................4

IV.   AIG'S BACT CLAIM FOR POC EMISSIONS ALSO FAILS. ......................7

V.    AIG'S POC EMISSION LIMITS CLAIM IS MOOT. .....................................9

VI.   SCHNITZER'S STOCKPILES AND TORCH CUTTING ARE EXEMPT. ....................9

VII.  AIG LACKS STANDING TO BRING THIS ACTION. .................................11

VIII. AIG'S REMEDIES ARE INAPPROPRIATE AND OUT OF SYNCH. ..........14

     A.     AIG's Injunctive Relief is Improper. .....................................................14

     B.     AIG's Civil Penalties are Manifestly Out of Synch and Unjustified....................16

IX.   CONCLUSION..................................................................................................18

# TABLE OF AUTHORITIES

Page(s)

Cases

*Atlantic States Legal Found., Inc., v. Universal Tool & Stamping Co., Inc.*
786 F.Supp.743 (D.N.D. 1992)..................................................................17

*Clarex Ltd. v. Natixis Sec. Am. LLC,*
2012 WL 4849146 (S.D.N.Y. 2012).......................................................13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*
528 U.S. 167 (2000)..............................................................6, 7, 11, 12

*Global Comm. Monitor v. Mammoth Pacific,*
230 F.Supp.3d 1235 (E.D. Cal. 2017), *vacated and remanded on other grounds*....................9

*Global Community Monitor v. Mammoth Pacific, L.P.,*
2015 WL 2235815 (E.D. Cal. 2015).......................................................15

*Idaho Conservation League v. Magar,*
2015 WL 632367 (D. Idaho 2015).........................................................16

*Nat'l. Parks Ass'n. v. Tennessee Valley Auth.,*
502 F.3d 1316 (11th Cir. 2007) ............................................................8

*Northwest Envtl. Def. Ctr. v. Cascade Kelly Holdings LLC,*
155 F.Supp.3d 1100 (D. Or. 2015).........................................................8

*Pound v. Airosol Co.,*
498 F.3d 1089 (10th Cir. 2007) ...........................................................16

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock,*
993 F.2d 800 (11th Cir. 1993) .............................................................13

*Romoland School Dist. v. Inland Empire Energy Center, LLC,*
548 F.3d 738 (9th Cir. 2008) ...............................................................2

*Sierra Club v. El Paso Gold Mines, Inc.,*
2003 WL 25265873 (D. Colo. 2003).....................................................16

*Sierra Club v. Portland Gen. Elec. Co.,*
663 F.Supp.2d 983 (D. Or. 2009) ........................................................16

*Steel Co. v. Citizens for a Better Environment,*
523 U. S. 83 (1998)..............................................................................6

*U.S. v. Blue Lake Power, LLC,*
215 F.Supp.3d 838 (N.D. Cal. 2016) .....................................................6

*U.S. v. Dell'Aquilla,*
  150 F.3d 329 (3d. Cir. 1998)..................................................................16

*U.S. v. Louisiana-Pacific Corp.,*
  682 F.Supp. 1141 (D. Colo. 1988)..........................................................15

*U.S. v. Mountain State Carbon LLC,*
  2014 WL 3548662 (N.D. W. Va. July 17, 2014)......................................16

*U.S. v. SCM Corp.,*
  667 F.Supp.1110 (D. Md. 1987)..............................................................14

*U.S. v. Vista Paint Corp.*
  1996 WL 477053 (C.D. Cal. 1996)..........................................................17

*U.S. v. Westvaco,*
  2015 WL 10323214 (D. Md. Feb. 26, 2015) ............................................15

*United States v. ConAgra, Inc.,*
  1997 WL 33545777 (D. Idaho 1997)........................................................17

*Viceroy Gold Corp. v. Aubry,*
  75 F.3d 482 (9th Cir. 1996) ....................................................................13

<u>Statutes and Codes</u>

United States Code
  Title 28, Section 2462 ...............................................................................8
  Title 33, Section 1251 *et seq.* (the "Clean Water Act")......................16, 17
  Title 42, Section 7401 *et seq.* (the "Clean Air Act") ..................... *passim*
  Title 42, Section 7413(e)(1) ...............................................................16, 18
  Title 42, Section 7604.................................................................................1
  Title 42, Section 7604(a)(1)....................................................................6, 12

DEFENDANT SCHNITZER STEEL INDUSTRIES, INC.'S TRIAL BRIEF
Case No.  3:21-cv-05246 MMC

1

<u>Rules and Regulations</u>

2

Bay Area Air Quality Management District (BAAQMD) Rules

3

Rule 2-1-115.1.4 ................................................................................................................10

Rule 2-1-121.1 ...................................................................................................................10

4

Rule 2-1-316 ......................................................................................................................10

Rule 2-1-319 ......................................................................................................................10

5

Rule 2-2-210 ......................................................................................................................11

Rule 2-2-301 ...............................................................................................................7, 8, 11

6

Rule 2-4-607 ........................................................................................................................2

Rule 2-6-209 ........................................................................................................................4

7

Rule 2-6-212 ........................................................................................................................4

Rule 2-6-230 ........................................................................................................................7

8

Rule 2-6-404 ........................................................................................................................5

Rule 2-6-407 .....................................................................................................................5, 6

9

Rule 6-4.............................................................................................................................10

Rule 8-2-301 ..................................................................................................................9, 14

10

Code of Federal Regulations

Title 40, Section 70.2 ..........................................................................................................4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT SCHNITZER STEEL INDUSTRIES, INC.'S TRIAL BRIEF
Case No.  3:21-cv-05246 MMC

1   Defendant Schnitzer Steel Industries, Inc. ("Schnitzer") submits this Trial Brief setting

2   forth its key contentions of fact and law for trial.

3   **I.    INTRODUCTION.**

4   This case involves four specific claims brought by Plaintiff Athletics Investment Group

5   LLC ("AIG") under the Clean Air Act ("CAA") citizen suit provision (42 U.S.C. § 7604).[1]  None

6   of these claims have merit and all are subject to clear affirmative defenses.  As a result, and as

7   evidenced by more than half of the documents on its exhibit list, AIG has resorted to irrelevant

8   arguments about Light Fibrous Material ("LFM") and other environmental issues having nothing

9   to do with this case.  These diversions will not succeed.  Rather, the evidence will show that

10  Schnitzer has complied with the regulations and requirements of the Bay Area Air Quality

11  Management District (the "District") as to each of the four asserted claims.

12  In essence, AIG asks this Court to second-guess highly technical permitting decisions

13  made by the District (a non-party to this action) over the course of 16 years.  AIG wants the

14  Court to "replace" those agency decisions with opinions of its litigation experts based on

15  information that was not available at the time the decisions were made.  None of those decisions

16  were challenged by AIG or anyone else at the time.  Neither the CAA nor District Rules

17  contemplate such a "retroactive approach" to enforcement.  Further, AIG asks for court orders

18  interfering with currently ongoing District technical evaluations of permit exemptions – all this

19  coming from a for-profit company abandoning the City of Oakland and lacking standing to sue.

20  Respectfully, the Court should reject AIG's claims and enter judgment for Schnitzer.

21  **II.    SUMMARY.**

22  **Title V (First Claim)**:  AIG claims that beginning in 2006 and until 2022, the shredder's

23  potential to emit certain regulated pollutants (Precursor Organic Compounds ("POCs") and

24  Hazardous Air Pollutants ("HAPs")) exceeded Title V thresholds, causing the Facility to be

25

26  [1] *See* Joint Pretrial Statement, filed May 25, 2024 (Dkt. 177). The factual background is
    described in Schnitzer's summary judgment motion, filed March 6, 2024 (Dkt. 121), and this

27  Trial Brief incorporates the facts and abbreviations set forth therein.  Effective January 1, 2024,
    Schnitzer changed its name to Radius Recycling, Inc.  For convenience, we continue to refer to

28  the defendant as Schnitzer.

1  classified as a "major facility" under Title V and requiring a Title V permit.  This claim has no

2  merit.  Prior to the enclosure of the shredder and source testing in 2017, Schnitzer and the

3  District had no information that POC and HAPs emissions could exceed Title V thresholds.  In

4  fact, the best information available at the time indicated that emissions were far below the

5  thresholds.  Following the 2017 enclosure, source testing of the shredder enabled Schnitzer and

6  the District for the first time to quantify previously-fugitive emissions and determine that POC

7  and HAPs emissions exceeded Title V levels.  Schnitzer filed a timely and complete application

8  for a Title V permit within the one-year deadline established by District Rules and has lawfully

9  operated under the "permit application shield" of Rule 2-4-607 since that time.[2]

10      Further, any alleged Title V violation is not "redressable" by the Court.  Schnitzer

11  submitted its Title V application more than three years before AIG brought this action, and the

12  evidence will show there was no "ongoing" Title V violation at the time the complaint was filed

13  or thereafter.  The Title V claim is also moot because the Facility's emissions have been

14  permanently reduced below Title V levels by Schnitzer's installation of new emission controls

15  and imposition of new enforceable permit conditions, obviating any need for a Title V permit.

16      **BACT (Second Claim)**:  AIG claims the shredder's emissions of POCs have exceeded

17  the threshold at which Best Available Control Technology ("BACT") is required, and that

18  Schnitzer has failed to install BACT since 2006.  This claim too has no merit.  Schnitzer

19  complied with the District's BACT determinations for both the 2006 shredder replacement and

20  the 2009 throughput increase; and, in any event, AIG's claims related to those past permitting

21  decisions are plainly barred by the applicable five-year statute of limitations.  In the case of the

22  2017 enclosure project (which did not increase the Facility's emissions), the District determined

23  the project was not subject to New Source Review ("NSR"), eliminating the need for any

24  consideration of BACT. The evidence will also show the shredder is already one of the most

25  tightly controlled shredders in the country and nothing further is required.

26

27  [2] The Title V program does not impose new substantive pollution control requirements on facilities; rather, it is an administrative mechanism that consolidates the requirements "already applicable to the source" in a single document.  *See Romoland School Dist. v. Inland Empire Energy Center, LLC*, 548 F.3d 738, 742 (9th Cir. 2008).

28

1    **Violations of Permit Conditions (Third Claim)**:  AIG claims Schnitzer exceeded POC

2  emission limits contained in the Facility's 2020 and 2021 Permits to Operate ("PTO").  Schnitzer

3  has acknowledged these exceedances, but they were corrected by the new emission controls

4  (RTOs and acid gas scrubbers) that became operational in April 2022.  This claim is moot

5  because Schnitzer permanently corrected the exceedances, and the 2021 and 2022 PTOs have

6  expired.  The limits contained in those permits have been superseded by more stringent POC

7  emission limits included in the PTOs for 2023 and 2024, and Schnitzer is operating in compliance

8  with these new limits.  Moreover, Schnitzer paid a $400,000 civil penalty for the prior permit

9  exceedances, making any further enforcement unwarranted.

10    **Unpermitted Sources (Fourth Claim)**:  AIG's final claim is that Schnitzer has failed to

11  obtain permits for its stockpiles and torch-cutting operations and to comply with BACT for these

12  operations, in alleged violation of District Rules.  However, these operations are exempt from

13  permitting under District Rules and are not subject to BACT requirements.  Even if these sources

14  were no longer eligible for exemption, District Rules regarding "loss of exemption" do not

15  provide for the imposition of BACT on previously exempt existing sources.  Moreover, the

16  measures proposed by AIG as BACT (a separate full enclosure and baghouse for each stockpile

17  and the torch-cutting operation) have never been identified as BACT for a metal shredding

18  facility.  The District itself is evaluating the exempt status of the stockpiles and torch-cutting,

19  including whether BACT is even applicable in the circumstances and, if so, what those measures

20  would be.

21    **Lack of Standing**:  All of AIG's claims are subject to a central fatal defect:  lack of

22  Article III standing to sue.  AIG's claim of standing is based on miniscule amounts of LFM

23  claimed to be present at its (now nearly vacant) office at 55 Harrison Street.  AIG has the burden

24  to establish standing, including that its alleged harm was caused by the violations alleged in the

25  complaint.  But the overwhelming weight of the evidence will show that AIG has not suffered

26  any "concrete" or "particularized" harm to its own interests that is "traceable" to the four claims

27  outlined above.  These essential elements of Article III standing are simply lacking in this case.

28  AIG's expert has admitted that none of the alleged CAA violations are related to LFM, and there

are no federally enforceable emission limitations or standards applicable to LFM.   Accordingly, LFM cannot provide a legitimate basis for Article III standing.

**Remedy**:  Finally, should the Court find any violations on any of AIG's claims, AIG's requests for injunctive relief and civil penalties reflect overreaches that are markedly out of synch with case precedent and the law.

## III.    THERE IS NO TITLE V VIOLATION FOR POCS OR HAPS.

**Merits**.  In 2006, when Schnitzer applied for a permit for the replacement shredder, it provided the District with the best emissions information available, including emission factors for POCs and HAPs in the Versar Workbook that was widely used by regulators across the country to estimate emissions from metal shredding facilities.[3]  Based on these emission factors, there was no indication that POC or HAPs emissions would exceed Title V thresholds.  The District reviewed this and other available information, and concluded the Facility was not subject to Title V.  Schnitzer was not required by any law or regulation at the time to enclose its shredder for Title V purposes.  In March 2007, after installation of the shredder, a source test confirmed that POC and HAPs emissions were significantly below Title V thresholds.[4]

Before the 2017 shredder enclosure, POC emissions were largely "fugitive" in nature and under District (and federal) rules did not count toward the Title V threshold.[5]  Fugitive emissions are emissions that "could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening."  Rule 2-6-209.  Whether emissions can "reasonably" pass through a stack is a fact-specific determination made by the permitting agency based on "ordinary practice" in the industry at the time—***not*** whether it is hypothetically possible for emissions to be routed through a stack.  Testimony will confirm that, in 2006, it was not ordinary

---

[3] Actual source test data was not available because the replacement shredder had not yet been constructed and there were no source test data from the prior shredder.

[4] The emission factor derived from this source test indicated POC emissions of roughly 7 tons per year ("tpy"), less than ***one-tenth*** of the Title V threshold of 100 tpy.  HAPs emissions were even less.

[5] Fugitive emissions of criteria pollutants, including POCs, are not included in a stationary source's potential to emit for Title V purposes unless the facility falls within one of 28 designated categories of industrial facilities.  Metal shredding facilities are not included on this list.  *See* Rule 2-6-212; 40 CFR § 70.2.

1   practice for metal shredders to fully enclose their operations, as alleged by AIG.  In fact, the

2   evidence will show that prior to enclosure of the Oakland shredder in 2017, ***there were no metal***

3   ***shredders operating in the U.S.*** with a near-total enclosure (or an EPA Method 204-equivalent

4   enclosure), much less 100% capture efficiency.[6]  Based on information available at the time, the

5   Facility was not "subject to" Title V in 2006 or at any time prior to the shredder enclosure and

6   completion of source tests in 2017.

7       Following the enclosure, Schnitzer and the District were able to quantify and measure

8   previously-fugitive emissions from the shredder.  The first source test was conducted in June

9   2017 and indicated that POC emissions were below the Title V threshold, though higher than

10  expected.  Further testing in October 2017, reported to the District in January 2018, first

11  indicated that POC emissions exceeded 100 tpy.[7]  Based on these results, the District ultimately

12  determined that the Facility became "subject to" Title V as of December 1, 2017.  Under District

13  Rules, this triggered a one-year period in which Schnitzer was required to submit a Title V

14  permit application.  Rule 2-6-404.  Schnitzer timely submitted a complete application in October

15  2018, before the deadline set by the District.[8]  The filing triggered the "permit application shield"

16  that remains in place today pending final action on the application.  *See* Rule 2-6-407 (a facility

17  is not subject to enforcement for failing to have a Title V permit if the facility has filed a

18  "complete and timely" Title V application).  Even if Schnitzer's application had been untimely,

19  this would not require Schnitzer to cease operating, as AIG erroneously claims; any period of

20  non-compliance would be limited to "the period between the submittal deadline and the actual

---

21  [6] Schnitzer installed the new, near-total enclosure to address requirements of the DTSC relating
22  to releases of the non-CAA substance, LFM, from the shredder.  The new enclosure increased
    the "capture efficiency," causing regulated air pollutants to be emitted through a stack and
23  susceptible to testing and measurement.  The enclosure was not required by any District
    regulation and is "near total" because certain openings are required for the shredder to function.
24  [7] Due to the technical complexity of source testing on metal shredders, there is typically a delay
25  up to several months between completion of the test and the report describing the results.  Further
    source testing conducted in 2019 also indicated that cumulative HAPs slightly exceeded the Title
26  V threshold (25 tpy), but by then Schnitzer had already submitted its Title V application.
    [8] Carol Allen, a District senior engineer and manager, testified that Schnitzer "submitted the
27  [Title V permit application] within the time frame that we [the District] identified."  Allen Depo.
28  Tr. 125:1-11 (Jan. 16, 2024).  In January 2019, the District provided notice that the application
    was complete.

DEFENDANT SCHNITZER STEEL INDUSTRIES, INC.'S TRIAL BRIEF
Case No.  3:21-cv-05246 MMC

1  submittal." Rule 2-6-407.

2      Against this history, AIG's Title V claim is based on a fundamentally flawed premise:

3  that later-obtained emissions data derived from source tests conducted at the Facility over ten

4  years after the replacement shredder was installed can be applied "retroactively" to impose

5  liability for actions taken many years before such information was known.  Nothing in the CAA

6  or caselaw, or EPA guidance, supports such a "retroactive" view.  As outlined above, the

7  evidence will show that the Facility did not become "subject to" Title V until December 1, 2017,

8  as determined by the District.

9      **Redressability**.  AIG must show, as an element of Article III standing, that "it is likely, as

10  opposed to merely speculative" that its claimed injuries "will be redressed by a favorable

11  decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*. 528 U.S. 167, 180-81 (2000)

12  ("*Laidlaw*").[9]  Standing must be established as to each claim at the time the complaint was filed

13  and at trial.  That is impossible here.  The "violation" claimed is failure to comply with Title V,

14  specifically, by failing to file a "timely" Title V permit application.  Schnitzer submitted its Title

15  V application on October 17, 2018, within the one-year period specified by the District and

16  *nearly three years before* AIG brought this action, and has continued to operate lawfully under

17  the District's "permit application shield."  As such, there was no "ongoing" Title V violation at

18  the time the complaint was filed and no prospect of future violation.  As such, there is no harm

19  that can be redressed by this Court, either through the imposition of penalties (which are payable

20  to the U.S. Treasury) or injunctive relief.[10]  AIG's Title V claim must be dismissed on this basis.

21      **Mootness**.  Similarly, the Title V claim must be dismissed for mootness.  A defendant's

22  compliance with the law moots a case where the defendant shows its conduct "could not

23

24  _____

[9] A citizen suit plaintiff "lack[s] standing to seek civil penalties for violations *that have abated*
25  *by the time of suit*." *Id.* at 187 (emphasis added).  A violation of an "emissions standard or
limitation" under the CAA must be *ongoing* at the time the complaint was filed.  *See* 42 U.S.C.
26  § 7604(a)(1); *U.S. v. Blue Lake Power, LLC*, 215 F.Supp.3d 838, 843 (N.D. Cal. 2016).
[10] *See, e.g., Steel Co. v. Citizens for a Better Environment*, 523 U. S. 83 (1998) (late reports were
27  filed prior to filing of citizen suit, depriving plaintiff of Article III standing to pursue wholly past
violations).

28

1  reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189 (citation omitted).  In July 2019 (two

2  years before the complaint was filed), Schnitzer applied to install two RTOs and acid gas

3  scrubbers to reduce emissions from the shredder below all applicable Title V thresholds.  Those

4  controls become operational in April 2022, and subsequent source testing confirmed these

5  controls reduced the Facility's emissions below Title V thresholds.  The Facility is now subject

6  to federally enforceable emission limits that restrict its potential to emit to below Title V

7  thresholds.  The District is processing a Synthetic Minor Operating Permit ("SMOP") which will

8  result in cancellation of the Title V application.[11] Accordingly, this Court cannot order any

9  effective relief as to AIG's Title V claim and it is moot.

10      **IV.    AIG'S BACT CLAIM FOR POC EMISSIONS ALSO FAILS.**

11      **Merits**.  Under District Rules, BACT is triggered for a "new" or "modified" source with

12  the potential to emit 10 or more pounds of specified pollutants per day.  Rule 2-2-301.  Schnitzer

13  has complied with all applicable BACT requirements as determined by the District.

14      In 2006, in evaluating Schnitzer's application for the shredder replacement, the District

15  found that BACT was required for particulate matter ("PM"), and was satisfied by the PM

16  emission controls to be installed on the new shredder.  Based on POC emission factors in the

17  Versar Workbook, the District also determined that POC emissions would be below the BACT

18  trigger level. No one contested this determination.

19      In 2007, Schnitzer applied to increase the shredder's annual "throughput" (the amount of

20  material fed to the shredder).  The District determined on the basis of the March 2007 source

21  tests that POC emissions would exceed 10 lbs./day at the higher throughput.  However, as

22  provided under District Rules, the District concluded that emission controls for POCs were not

23  cost-effective and therefore did not require controls to be installed.  The PTO for the throughput

24  increase was issued in 2009.  No one contested this determination.

25      In 2017, the District determined that the enclosure project was not subject to NSR as it

26

27  [11] A "synthetic minor facility" is a facility "which, by imposition of enforceable permit
    conditions, has its potential to emit limited to below the threshold levels for a major facility."
    Rule 2-6-230.  Schnitzer applied for the SMOP in July 2019 at the same time it proposed to
28  install the RTOs and acid gas scrubbers.

1   involved no emission increases.  As such, the project was not subject to BACT.  No one

2   contested this determination.

3          Against this history, AIG now claims that beginning in 2006, BACT for POC emissions

4   from the replacement shredder was a permanent total enclosure fully meeting EPA Method 204

5   design criteria and performance specifications, coupled with an RTO.  But this claim, like AIG's

6   Title V claim, is improperly based on data obtained 10 years after-the-fact, not on data that was

7   available at the time.  In addition, there is no credible evidence that the control measures

8   advocated by AIG's expert were "achieved in practice" at that time (2006) in the metal shredding

9   industry.  To the contrary, the evidence will show that in 2006 there were **no metal shredders**

10  operating in the United States with a total Method 204 enclosure and RTOs.  Even to this day

11  there is no shredder in the U.S. that has a fully compliant Method 204 enclosure.  AIG's claim

12  contradicts the technical BACT decisions made by the District over a decade or more ago, which

13  decisions are entitled to deference.  *See Northwest Envtl. Def. Ctr. v. Cascade Kelly Holdings*

14  *LLC*, 155 F.Supp.3d 1100, 1126 (D. Or. 2015) (state agency's "technical determinations within

15  its area of expertise" entitled to deference).

16         **Time Bar**.  Citizen suits under the CAA are subject to a five-year statute of limitations.

17  28 U.S.C. § 2462.  The five-year period begins to run when the violation "first occurs," not when

18  the plaintiff first discovers the violation.  *Nat'l. Parks Ass'n. v. Tennessee Valley Auth.*, 502 F.3d

19  1316, 1322 (11th Cir. 2007).  Here, the District made BACT determinations in 2006 and 2009

20  for the shredder replacement and throughput increase, finding in each case that BACT for POC

21  emissions was not required.  Any challenges to those decisions were barred as of 2011 and 2014,

22  respectively.  *See id.* at 1324 (CAA claims brought nearly 20 years after power plant

23  modification were "completely time-barred").

24         AIG cannot avoid the five-year limitations period by claiming the alleged BACT

25  violations are "continuing" or "ongoing."  As explained in Schnitzer's Summary Judgment

26  Motion (Dkt. 121, at 19-22), the obligation to install BACT is a one-time obligation tied to the

27  construction permitting process and is not "continuing" in nature.  *See* Rule 2-2-301.  Schnitzer

28  had no ongoing obligation to install BACT once the District determined that BACT was not

applicable to a particular application.[12]  Allowing AIG to challenge the District's technical

permitting determinations more than 10 years later, based on information acquired through a

source testing program that could not have been conducted prior to 2017, would defeat the very

purpose of the statute of limitations to protect settled expectations and bar stale claims.

## V.    AIG'S POC EMISSION LIMITS CLAIM IS MOOT.

AIG claims that Schnitzer violated the POC emission limits in its 2020 and 2021 PTOs.

Like its Title V claim, this claim is moot.  First, Schnitzer has resolved these violations through

installation of the RTOs and acid gas scrubbers which permanently reduced POC emissions to

below the permit limits.  The obligation to install these emission controls was based on

exceedance of a regulatory "total carbon" emission limit set forth in Rule 8-2-301, as

documented in a 2020 Compliance and Settlement Agreement ("CSA") with the District.  The

CSA required Schnitzer to install the RTOs by December 2022, and to pay a civil penalty of

$400,000 to address violations of Rule 8-2-301 and the corresponding POC permit limits that

would continue pending installation of the RTOs.  The evidence will show that the POC limits at

issue in AIG's complaint (Condition # 27085) were based on the maximum daily emissions

allowed under Rule 8-2-301 and that violations of these limits were resolved through the CSA.

Second, the emissions limits in Condition # 27085 have been superseded by more

stringent emission limitations reflected in Schnitzer's current permit.  Schnitzer completed

installation of the RTOs in April 2022 (eight months ahead of schedule) and has been in

compliance with its new limitations since then.  As the past violations were permanently

corrected, the permit conditions have been superseded, and a significant penalty has been

assessed by the District, the Court cannot order any effective relief and AIG's claim is moot.

## VI.    SCHNITZER'S STOCKPILES AND TORCH CUTTING ARE EXEMPT.

**Exemption from Permitting**.  The stockpiles and torch cutting activities are exempt

from permitting and are not subject to BACT.  The evidence will show that over many decades

---

[12] Because AIG's claims for civil penalties are time-barred, its claims for injunctive relief with respect to these same alleged violations are also barred under the "concurrent remedies" doctrine. *See, e.g., Global Comm. Monitor v. Mammoth Pacific,* 230 F.Supp.3d 1235, 1244 (E.D. Cal. 2017), *vacated and remanded on other grounds.*

1    of operation, the District has frequently inspected the Facility and has not required a permit for

2    these activities.[13]  Nor has it issued any notices of violation to Schnitzer for failure to have a

3    permit.  Schnitzer's current PTO expressly acknowledges the use of stockpiles at the Facility and

4    requires "water spray to minimize fugitive dust emissions from material/scrap handling and

5    storage," *i.e.*, stockpiles.  The Facility must also comply with a District-approved Emissions

6    Minimization Plan ("EMP"), under Rule 6-4, which addresses the stockpiles and requires

7    measures, including regular watering, to minimize PM emissions from the piles.

8        AIG contests this analysis and also argues that various "exceptions" apply, such that the

9    stockpiling and torch-cutting operations are not eligible for exemption.[14]  AIG claims, for

10   example, that Rule 2-1-316, which applies to "new or modified" sources that emit toxic air

11   contaminants ("TACs") exceeding certain trigger levels and risk thresholds, precludes

12   exemption.  But AIG has produced no credible evidence that TACs from Schnitzer's stockpiles

13   or torch-cutting operations would exceed acceptable risk levels or be subject to any other

14   "disqualifying" condition in the District Rules.  To the contrary, the evidence will show that the

15   emission levels from the stockpiles and torch-cutting operations meet applicable exemption

16   criteria, and that the risk analyses conducted by AIG's experts are based on inaccurate emission

17   estimates and unrealistic operating scenarios that greatly overestimate Schnitzer's and the

18   District's own risk assessments.[15]

19        **<u>Stockpiles and Torch Cutting are not Subject to BACT</u>**.  AIG also claims that the

20   stockpiles and torch-cutting operations are subject to BACT requirements, and that BACT for

21

22   [13] The stockpiles are exempt under Rule 2-1-115.1.4 which applies to "storage or weigh
     hopper/bin systems" located at "vehicle shredding" facilities if they "process exclusively
23   material with a moisture content greater than or equal to 5 percent by weight."  The torch cutting
     operations are exempt under Rule 2-1-121.1, which applies to "equipment used for . . . cutting . .
24   . metals . . . provided that organic emissions from the use of coolant, lubricant, or cutting oil are
     5 ton/yr or less."
25   [14] Both exemptions are subject to the conditions set forth in Rule 2-1-319 and the rules
     referenced therein.  *See* Rule 2-1-319 (limiting emissions of regulated air pollutants to less than 5
26   tons/year); Rule 2-1-316 (limiting emissions from "new or modified sources" of TACs or HAPs).
     [15] The evidence will show that the District itself is evaluating the permit status of the stockpiles
27   and torch-cutting operations at the Facility and has preliminarily concluded that the torch-cutting
     operations and almost all of the stockpiles are likely exempt.  The District has not yet completed
28   its evaluation.

every stockpile and for torch-cutting is a "permanent total enclosure" that complies with EPA Method 204, with venting to a baghouse.  Because these operations are exempt from permitting, they are not subject to BACT requirements.  However, even if one or more stockpiles or the torch-cutting required District permits, AIG has not shown by credible evidence that these sources emit 10 lbs./day or more of a BACT pollutant.[16]  Further, even if BACT were triggered in any case, it is the District's responsibility – not AIG's expert's – to determine in the first instance what would constitute BACT.  This decision must be left to the District's technical and engineering judgment, and the Court should reject AIG's invitation to invade or preempt that discretion.[17]

The evidence will show that AIG's expert mistakenly approaches this as a "one size fits all" proposition, ignoring that the stockpiles contain different materials, have different emission profiles, and must be evaluated separately. If the District were to find that any stockpile required a permit, it would assess that individually and determine whether the emission of any BACT pollutant exceeds the BACT trigger level; and if so, then identify what emissions control(s) constitute BACT, taking into account the nature of the operations and the cost-effectiveness of any controls.  There is no credible evidence that BACT for each of the stockpiles would automatically be a full EPA Method 204-compliant enclosure and baghouse, with no other options, as AIG claims.  This is manifestly a matter for expert agency evaluation.

## VII.    AIG LACKS STANDING TO BRING THIS ACTION.

AIG has failed to show that it has suffered "concrete" or "particularized" harm to its own interests in this case.[18]  To establish Article III standing, AIG must show (1) an "injury in fact," (2) that is *"fairly traceable"* to Schnitzer's alleged violations, and (3) that is "likely to be redressed by a favorable judicial decision."  *Laidlaw,* at 180-181 (emphasis added).  AIG

---

[16] Emissions of TACs or HAPs are not subject to BACT.  Rule 2-2-301; Rule 2-2-210.

[17] Almost $100 million of AIG's overreaching civil penalty calculations are based on the stockpiles and the fallacious "one size fits all" assumption.  The District could find the stockpiles are exempt; determine that existing watering is sufficient; or, if anything additional is needed, that increased watering would cost-effectively control emissions.

[18] *Laidlaw,* 528 U.S. at 180-81; *see* Schnitzer's Motion for Summary Judgment ("Schnitzer MSJ," Dkt. 121).

initially tried to base standing on the ballpark/mixed use project it proposed to build on the Howard Terminal site adjacent to Schnitzer's long-established Facility.[19]  Having abandoned that project for a new Las Vegas home,[20] AIG now attempts to rely on (1) alleged harm to AIG employees or nearby residents, and (2) alleged harm to property interests at two leased offices in West Oakland.  Neither provides a sufficient basis for standing.

**Employees/Third Parties**.  AIG originally alleged harm or threatened harm to employees and/or nearby residents from air emissions and releases of LFM from Schnitzer's Facility.  But as this Court already noted, "I don't think that one really flies."[21]  There is good reason for that.  First, LFM is not a regulated pollutant under the CAA and is unrelated to any "emissions standard or limitation" enforceable under the Act.  *See* 42 U.S.C. § 7604(a)(1). Indeed, AIG's expert has admitted that none of the alleged violations "relate to" LFM.  The claimed injuries must be traceable to the claimed violations, not some other subject.  Second, even if constituents entrained within LFM were themselves potentially subject to regulation as air pollutants, AIG has not provided credible evidence of ***actual harm***, or a credible threat of harm, to anyone from either LFM or its constituents.  In fact, AIG has stipulated that it has *no fact witnesses* who can testify to such harm;[22] and AIG provided no warnings and undertook no mitigating measures for its employees or property.  Conjecture and speculation by AIG's litigation experts is not sufficient.  *Laidlaw,* at 181 (injury must be "concrete and particularized" and "actual or imminent, ***not conjectural or hypothetical***" (emphasis added)).

Furthermore, AIG cannot assert standing based on alleged harm to its employees or other third parties not before the Court.  "Prudential limitations on standing 'require that parties assert

---

[19] This case began as an effort by AIG to shut down Schnitzer operations because the Athletics wanted to build a new ballpark, 3,000 condos and other massive development at the Howard Terminal site.  AIG changed its game plan when the City could not provide enough public infrastructure funding or reduce affordable housing requirements to AIG's liking.

[20] Pending completion of their new stadium in Las Vegas, the A's will play in Sacramento. Their "headquarters" at 55 Harrison Street in Oakland is now a ghost town.

[21] *See* May 3, 2024 Transcript of Proceedings, at 7:13-20: "So there's also an argument about potential injuries to employees. That one I don't think really flies...[W]e don't have, for example, an association with members here. This is an employer and employee. So I'm not going to go into that one. I don't think that one really flies."

[22] Dkt. 121-1, at 30-32.

1    their own rights rather than rely on the rights or interests of third parties.'" *Viceroy Gold Corp.*

2    *v. Aubry*, 75 F.3d 482, 488 (9th Cir. 1996) (citation omitted).  AIG, a for-profit company that

3    operates a baseball team, cannot rely vicariously on asserted environmental harm to its

4    employees, Oakland residents or other third parties to gain standing.[23]

5        **Harm to Property Interests**.  AIG also alleges harm to "property interests" resulting

6    from claimed LFM at two office properties leased by AIG or an affiliate in West Oakland.  But

7    AIG has no property interest in 10 Clay Street, which is leased by an "affiliate" that is not a party

8    to this action.  *See Clarex Ltd. v. Natixis Sec. Am. LLC,* 2012 WL 4849146, at *6 (S.D.N.Y.

9    2012) ("one corporation cannot assert an affiliate's legal rights.").  As for 55 Harrison, AIG has

10   not shown any concrete or "particularized" harm to *its own* property or business interests from

11   LFM or any air pollutant.  While AIG leases the third floor, including an unknown number of

12   parking spaces in an adjacent parking garage, overwhelming expert testimony will show there is

13   no "damage" ***to property interests*** based on any regulated air pollutant, or from the minuscule

14   presence of LFM for that matter.  AIG's claim of harm to property interests is based on two

15   small samples of material collected from the outer wall of the building and an outdoor "third

16   floor alcove" of the property.  But AIG has not presented any credible evidence that the material

17   collected is ***actually*** LFM or ***actually present*** within the boundaries of AIG's leasehold, much

18   less in amounts that would cause cognizable harm to any "property interest."  Indeed, AIG's

19   expert has testified "there was no LFM in the building" at 55 Harrison Street.

20       AIG has suggested in passing that it has standing based on a "trespass" theory due to the

21   alleged entry of LFM onto its leased property.  However, as noted above, LFM is not a regulated

22   pollutant under the CAA, and the alleged injury is not traceable to any of the four claims.  AIG

23   did not allege a trespass cause of action in its complaint.  Even if such a claim were viable, AIG

24   has not presented any credible evidence that LFM is present at 55 Harrison within the boundaries

25   of AIG's leasehold, much less in amounts that might rise to the level of trespass.

26

27   [23] Courts have consistently rejected such efforts. *See, e.g.*, *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 (11th Cir. 1993) (rejecting companies' efforts "to assert their employees' interest in the environment to gain standing in this case"); *see also*

28   Schnitzer MSJ, at 14-15 (citing cases).

DEFENDANT SCHNITZER STEEL INDUSTRIES, INC.'S TRIAL BRIEF
Case No.  3:21-cv-05246 MMC

1

**VIII.   AIG'S REMEDIES ARE INAPPROPRIATE AND OUT OF SYNCH.**

2

While none of AIG's claim have merit and the Court need not reach the topic of

3

remedies, Schnitzer must also point out the serious deficiencies with AIG's approach to

4

injunctive and civil penalty relief.

5

**A.    AIG's Injunctive Relief is Improper.**

6

**Title V and POC Limit Claims**.   As to the Title V and POC limit claims, there is no

7

"ongoing" non-compliance to enjoin.  Schnitzer applied for a Title V permit in 2018; installation

8

of the RTOs in 2022 brought emissions below Title V and Rule 8-2-301 thresholds; and the

9

District is in the process of issuing a SMOP and will cancel the Title V application.  In these

10

circumstances, there is no basis for non-monetary coercive relief.  *See U.S. v. SCM Corp*., 667

11

F.Supp.1110, 1128 (D. Md. 1987) ("[W]here there are no present violations and no cognizable

12

danger of future violations, injunctive relief is inappropriate and should be denied").

13

For example, Plaintiff asks the Court to enjoin operation of the entire Facility until the

14

District issues the SMOP.  Such a draconian restriction would be unjustified and inconsistent

15

with the District's regulation of the Facility.  The evidence will show the shredder is operating

16

with emissions below all Title V thresholds, in accordance with federally enforceable permit

17

limits constraining its potential to emit.  Even AIG concedes at this point that a Title V permit is

18

not required.  Enjoining operations would cause significant harm not only to Schnitzer, but to the

19

scrap metal recycling capacity in California in which the Oakland Facility plays a critical role.

20

**Shredder BACT**.  The Court should decline AIG's request to require construction of a

21

new or modified enclosure of the shredder that is fully compliant with Method 204.[24]  As noted

22

*supra*, the enclosure project in 2017 did not trigger BACT, as it did not increase emissions from

23

the shredder, nor was BACT for POCs imposed.  This was proper action on the District's part

24

and no one challenged it.  Moreover, the District has never determined ***for any shredder*** that a

25

fully compliant Method 204 enclosure constitutes BACT.  The evidence will show that

26

27

28

---

[24] The evidence will show that the Facility constructed the enclosure to satisfy EPA Method 204 (which was designed for a different industry) as closely as practicable, not as a requirement but as a guidepost, and anything further is not only unnecessary, but likely infeasible.

Schnitzer's Facility, with its near total enclosure and two RTOs and acid gas scrubbers, is one of the most tightly controlled facilities in the country, and there is no basis for requiring the enclosure to be retrofitted or rebuilt.

**Storage Piles and Torch-cutting**.  As discussed above, any decision to require enclosure for any storage pile or for torch-cutting would first be subject to a series of questions – that no exemption applies, that a permit is required, that BACT is triggered, and that BACT is enclosure. To the extent the Court would find that any storage pile or torch cutting operations ***might*** require a permit, the most it could order is that Schnitzer apply for an exemption and/or a permit from the District.  But it is up to the District in the first instance to determine if any permit is actually required, how many permits are needed, whether emissions exceed the BACT trigger level, and what form of BACT is appropriate (if any) taking into account all governing regulations including cost-effectiveness.  The Court cannot accept AIG's improper suggestion to step into the agency's shoes on such topics.[25]

The evidence will show that the stockpiles differ markedly.  AIG's one-size-fits-all approach (*i.e.,* full enclosure and baghouse for all) fails to take into account all the other factors the District must consider in a permit process, such as cost-effectiveness, technical feasibility, functionality, and others.  Here, the District, a non-party, is already undertaking a review of the permit exemption issue relating to the stockpiles and torch-cutting.  If the Court finds any violation, it can require Schnitzer to apply to the District, but it cannot dictate specific permitting requirements or BACT for these operations.  *See, e.g., Global Cmty. Monitor v. Mammoth Pacific, L.P.*, 2015 WL 2235815 (E.D. Cal. 2015), at *5 ("While the Court would have the authority to order Defendants to apply for permits, it does not have the authority to order Defendants to obtain permits.  Only the Air District can issue permits to Defendants…").

---

[25] *See, e.g., U.S. v. Westvaco*, 2015 WL 10323214 (D. Md. Feb. 26, 2015), at *10 ("An actual BACT determination is the result of an administrative process.  The Court cannot, realistically, issue an injunction that would require an actual BACT administrative determination"); *U.S. v. Louisiana-Pacific Corp.*, 682 F.Supp. 1141, 1164 (D. Colo. 1988) ("[T]he determination of what controls constitute BACT for a particular source is an agency determination to be made by EPA, and not by this court.")

DEFENDANT SCHNITZER STEEL INDUSTRIES, INC.'S TRIAL BRIEF
Case No.  3:21-cv-05246 MMC

**B.** **AIG's Civil Penalties are Manifestly Out of Synch and Unjustified.**

In assessing civil penalties under the CAA, courts apply the eight statutory penalty criteria set forth in 42 U.S.C. § 7413(e)(1).[26]  While the Court must take all of the criteria into account, it has substantial discretion in balancing the various factors and determining any ultimate penalty.  *See U.S. v. Mountain State Carbon LLC*, 2014 WL 3548662, at *34 (N.D. W. Va. July 17, 2014) (district courts given "wide deference in making the 'highly discretionary calculations necessary to award civil penalties'") (citation omitted). However, a final penalty must bear a "reasonable and proportionate 'nexus'" to the violations. *U.S. v. Dell'Aquila*, 150 F.3d 329, 338 (3d. Cir. 1998).

Here, AIG proposes an outrageous penalty of "at least" $182,950,000, many multiples beyond most CAA precedent and vastly beyond cases involving metal shredders.[27]  This assertion is based largely on AIG's erroneous treatment of "economic benefit" (or "avoided costs") for the shredder and the stockpiles for a period of 16 years – even though, as admitted by AIG, any penalties are limited to the five-year period preceding suit.  *See, e.g., Sierra Club v. Portland Gen. Elec. Co.,* 663 F.Supp.2d 983, 994 (D. Or. 2009).  The evidence will show there are serious deficiencies with AIG's penalty assessment as to both "economic benefit" and other criteria, including that AIG seeks to penalize violations going beyond the statute of limitations.

Among other things, AIG's expert employed EPA's "BEN Model" to arrive at an economic benefit figure based on 16 years of "avoided costs."  This was improper as the calculation of economic benefit itself must be limited to five years consistent with the statute of limitations.[28] AIG in discovery and its expert report presented no avoided cost calculation other

---

[26] "The penalty provisions of the CAA and the Clean Water Act (CWA) are virtually identical; thus, CWA cases are instructive in analyzing issues arising under the CAA." *Pound v. Airosol Co.*, 498 F.3d 1089, 1094, n.2 (10th Cir. 2007).

[27] AIG's expert selected three of the highest outcomes in CAA history (massive Toyota auto recall violations ($180 million) and two oil refineries (Tesoro, $27.5 million; BP, $31.4 million)) to discuss; but even the second highest of those one *is over $150 million below AIG's claim here*.  Moreover, as the attached bench-marking analysis shows, the vast majority of CAA cases have far lesser awards, and metal shredder cases have not exceeded $555,000.

[28] *See, e.g., Idaho Conservation League v. Magar*, 2015 WL 632367, at *5, n.9 (D. Idaho 2015) (finding it "appropriate to only consider [defendant's] economic benefit of noncompliance" within the five-year limitations period); *Sierra Club v. El Paso Gold Mines, Inc.*, 2003 WL

DEFENDANT SCHNITZER STEEL INDUSTRIES, INC.'S TRIAL BRIEF
Case No.  3:21-cv-05246 MMC

than 16-years, thus failing to meet its burden of proof with respect to "avoided costs" over any shorter period.

If the Court were to consider any civil penalty on the facts here, it should exercise its discretion to adjust any penalty significantly downward based on evidence presented by Schnitzer under the following statutory factors, among others:

- **Size of the business and economic impact of the penalty**. Schnitzer's net worth has decreased markedly, and a penalty of the magnitude proposed by AIG would cause significant hardship.

- **Violator's full compliance history and good faith efforts to comply**. Schnitzer has worked closely with the District to install state-of-the-art and first-in-country abatement equipment at the Facility to reduce emissions, and it has a strong record of compliance with applicable District Rules.[29]

- **Payment by the violator of penalties previously assessed for the same violation**. Under the CSA, Schnitzer has already paid a $400,000 penalty to the District for exceedances of the prior POC emission limits. This should result in a downward penalty adjustment.[30]

- **Economic benefit of noncompliance**. Schnitzer's only competitor in the Bay Area does not have a Method 204 enclosure or RTO, and no other California shredder has a Method 204 enclosure for its shredder or any stockpiles. As such, Schnitzer had gained no competitive or economic advantage; indeed, it is the opposite – Schnitzer has incurred far more costs than its competitors. Further, AIG's calculated "avoided costs" for the shredder fail to take into account costs already incurred by Schnitzer in installing the enclosure and controls in 2017, and mistakenly assume an entirely new shredder enclosure, built from the ground up, is needed. Also, AIG's calculation of economic benefit from an alleged failure to enclose all the Facility's stockpiles improperly assumes that all stockpiles are subject to identical BACT requirements, and that each and every one would need to be enclosed and controlled in the same overly-expensive manner.

---

25265873, at *6-8 (D. Colo. 2003) (assessing only the "economic benefit defendant realized during the relevant [five-year] limitations period"); *United States v. ConAgra, Inc.*, 1997 WL 33545777, at *25 (D. Idaho 1997) (granting defendant's motion to exclude "evidence of violations and economic gain occurring outside the limitations period" for CWA citizen suits).

[29] *See, e.g., Atlantic States Legal Found., Inc., v. Universal Tool & Stamping Co., Inc*. 786 F.Supp.743 (D.N.D. 1992) (reducing maximum penalty of more than $25 million to $450,000 after considering, among other factors, defendant's good faith compliance efforts).

[30] *See, e.g., U.S. v. Vista Paint Corp*. 1996 WL 477053 (C.D. Cal. 1996) (partial payment of civil penalty to air district based on same violations alleged in enforcement action was a mitigating factor).

- **Other Factors as Justice May Require**.  The Court should exercise its discretion to adjust any penalty downward based on other factors, including Schnitzer's position as a leader in advancing pollution controls for the shredding industry and voluntarily sharing knowledge gained and emissions data with regulatory agencies; Schnitzer's reliance on District exemptions; and approval of the Emissions Minimization Plans requiring mitigation of any particulate emissions from the stockpiles.

Finally, as noted above, AIG's requested penalty is significantly outside the range of civil penalties assessed in CAA actions involving stationary sources, including metal shredding facilities, which range from $150,000 to $555,000.  *See* Attachment A.  If any violation were found, the Court should base any penalty on the criteria in section 7413(e)(1) and reach an outcome commensurate with the range indicated by the bench-marking survey.

## IX.    <u>CONCLUSION.</u>

Based on the law and the evidence to be presented at trial, AIG's claims should be denied and judgment entered in favor of Schnitzer.

Dated: October 25, 2024                    Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:    */s/ Ronald Van Buskirk*
RONALD VAN BUSKIRK
Attorneys for Defendant
SCHNITZER STEEL INDUSTRIES, INC.

**Attachment A: Civil Penalties in Clean Air Act Citizen Suits and Enforcement Actions (2018 - 2024)[1]**

| Case | Civil Penalty | Violation Period | Date and Type of Resolution |
|---|---|---|---|
| **Metal Recycling Industry** | | | |
| *U.S. v. Gershow Recycling Corp.,* No. 2:24-cv-05794 (E.D.N.Y.) | **$555,000** for alleged operation of metal shredder without reasonably available control technology (RACT). | Not specified. | August 2024<br>Consent Judgment |
| *U.S. v. RJ Torching, Inc., d/b/a RJ Industrial Recycling,* No. 2:23-cv-13056 (E.D. Mich.) | **$150,000** for SIP violations (excess opacity and open burning) and violations of earlier EPA Consent Order at two scrap metal facilities. | 8 years; 3 years | December 2023<br>Consent Decree |
| *U.S. v. Upstate Shredding, LLC, et al.,* No. 3:23-cv-847 (N.D.N.Y.) | **$400,000** for Title V and SIP violations for failure to implement RACT to control VOC emissions. | Approx. 13 years | July 2023<br>Consent Decree |
| *U.S. v. Derichebourg Recycling USA,* No. 4:22-cv-00060 (S.D. Tex.) | **$442,500** for failing to ensure refrigerant in appliances accepted for recycling was properly recovered before disposal at three facilities. | Approx. 3 years | January 2022<br>Consent Decree |
| *In re Seller Industries, Inc.,* EPA Region 5, Dkt. CAA-05-2021-0026 | **$500,000** for Title V and SIP violations at a metal shredding and recycling facility in Illinois. | Not specified. | August 2021<br>Admin. Settlement |
| *In re SMM New England Corp.,* EPA Region 1, Dkt. CAA-01-2020-0056 | **$250,000** for Title V and SIP violations for operating without a Title V permit at scrap metal facility in Rhode Island. | Approx. 7 years | September 2020<br>Admin. Settlement |
| **Petroleum Industry** | | | |
| *U.S. v. Marathon Oil Co.,* No. 1:24-cv-00136-DMT-CRH (D. ND) | **$64,500,000**[2] for violations of Federal Implementation Plan, Title V and PSD violations at nearly 90 oil and natural gas production facilities | Approx. 9 years | August 2024<br>Consent Decree |
| *U.S. v. BP Products N.A., Inc.,* No. 2:23-CV-166 (N.D. Ind.) | **$40,000,000** for violations of NESHAP standards for benzene waste and New Source Performance Standards (NSPS) for VOC emissions | At least 11 years | August 2023<br>Consent Decree |
| *U.S., et al. v. Tesoro Refining & Marketing Co. LLC.,* No. 5:16-cv-00722 (W.D. Tex.) | **$27,500,000** for violations of a 2016 consent decree for excess NOx emissions between July 1, 2018 and May 1, 2020 at oil refinery. | Approx. 2 years | April 2023<br>Consent Decree |
| *Environment Texas Citizen Lobby v. ExxonMobil Corp.,* 5th Cir. (No. 17-20545) | **$14,251,302** assessed by district court for thousands of days of permit violations occurring over a period of nearly a decade. *Pending rehearing.* | Approx. 8 years | March 2021<br>Judicial Order |
| *U.S., et al. v. HollyFrontier El Dorado Refining LLC,* No. 2:20-cv-02270 (D. Kan.) | **$4,000,000** for H2S emission exceedances and failure to comply with chemical accident prevention safety requirements at oil refinery. | Approx. 3 years | May 2020<br>Consent Decree |

---

[1] This table omits EPA settlements involving automotive manufacturers and others wholly dissimilar from the circumstances and claims in this lawsuit.

[2] Largest CAA civil penalty imposed on a stationary source to date. *See* https://www.epa.gov/newsreleases/epa-and-justice-department-announce-2415m-settlement-marathon-oil-reduce-climate-and.

| Case | Civil Penalty | Violation Period | Date and Type of Resolution |
|------|---------------|------------------|------------------------------|
| *U.S., et al. v. Sprague Resources LP, et al.*, No. 1:20-cv-11026 (D. Mass.) | **$350,000** for operating oil storage tanks without requisite permits at petrol storage/distribution facilities. | Not specified | May 2020 [Consent Decree] |
| *U.S., et al. v. K.P. Kauffman Company, Inc.*, No. 1:18-cv-02559 (D. Colo.) | **$1,000,000** for failure to minimize VOC emissions from oil and gas operations. | Approx. 5 years | January 2020 [Consent Decree] |
| *U.S., et al. v. HighPoint Operating Corp.*, No. 1:19-cv-1151 (D. Colo.) | **$550,000** for failure to control VOC emissions from oil and gas operations at condensate storage tank facility. | Approx. 2 years | April 2019 [Consent Decree] |
| *Environment America, Inc., et al. v. Pasadena Refining Systems Inc.*, No. 4:17-cv-00660 (S.D. Tex.) | **$3,525,000** in CAA citizen suit alleging defendant operated without a valid permit and violated PM, NOx, and VOC emission limits at oil refinery. | 2 years | September 2018 [Consent Decree] |
| **Natural Gas Facilities** | | | |
| *U.S., et al. v. The Williams Companies, et al.*, No. 1:23-cv-00994 (D. Colo.) | **$3,750,000** for failure to comply with multiple VOC and HAP requirements under NSPS and NESHAP standards. | Not specified | April 2023 [Consent Decree] |
| *U.S., et al. v. WES DJ Gathering LLC*, No. 1:20-cv-01931 (D. Colo.) | **$3,500,000** for failure to comply with LDAR requirements under NSPS and NESHAP. | Approx. 6 years | April 2023 [Consent Decree] |
| *U.S., et al v. MPLX LP*, No. 2:23-cv-00252 (D. Utah) | **$2,000,000** for failure to comply with VOC emission control requirements, and violation of NESHAP and Title V permit requirements. | Not specified | April 2023 [Consent Decree] |
| *U.S., et al. v. DCP Operating Co., LP, et al.*, No. 1:22-cv-01829 (D. Colo.) | **$3,250,000** for failure to comply with LDAR requirements under NSPS and NESHAP. | Approx. 5 years | July 2022 [Consent Decree] |
| *U.S., et al. v. MPLX LP, et al.*, No. 3:18-cv-02526 (N.D. Ohio) | **$925,000** for failure to comply with VOC emission control, LDAR, and enclosed combustor testing and monitoring requirements. | Various; up to 3 years | November 2018 [Consent Decree] |
| *U.S. v. Aux Sable Liquid Products LP*, No. 1:18-cv-07198 (N.D. Ill.) | **$2,700,000** for excessive VOC emissions, failure to comply with NSPS and LDAR requirements, and not correctly reporting VOC/NOx emission limits. | Approx. 2 years | October 2018 [Consent Decree] |
| **Chemical Plants (Flares and Flaring)** | | | |
| *U.S. v. Chevron Phillips Chemical Company LLP*, No. 4:22-cv-737 (S.D. Tex.) | **$3,400,000** for violations of New Source Review/Prevention of Significant Deterioration (NSR/PSD) and Minor New Source Review, NSPS, others. | Approx. 13 years | March 2022 [Consent Decree] |
| *U.S. v. Equistar Chemicals L.P., et al.*, No. 4:21-cv-03359 (S.D. Tex.) | **$3,400,000** for violations of NSR/PSD and Minor New Source Review, NSPS, NESHAP, Title V and Title V facility permits, and state SIPs. | Not specified | October 2021 [Consent Decree] |
| *U.S., et al. v. The Dow Chemical Company, et al.*, No. 2:21-cv-00114 (E.D. La.) | **$3,000,000** for violations of NSR/PSD and Minor New Source Review, NSPS, NESHAP, Title V and Title V facility permits, and state SIPs. | Approx. 12 years | January 2021 [Consent Decree] |

| Case | Civil Penalty | Violation Period | Date and Type of Resolution |
|---|---|---|---|
| *U.S., et al. v. Shell Chemical LP*, No. 2:18-cv-1404 (E.D. La.) | **$350,000** for violations of NSR/PSD and Minor New Source Review, NSPS, NESHAP, Title V and Title V facility permits, and Louisiana SIP. | Approx. 9 years | February 2018 Consent Decree |
| **Miscellaneous Industries** | | | |
| *PennEnvironment, Inc. v. U.S. Steel Corp.*, W.D. Pa. (No. 2:19-cv-00484) | **$500,000** civil penalty and $4,500,000 additional settlement payment for H2S and SO2 exceedances and failure to operate pollution control equipment at iron and steel plants. | At least 4 months | January 2024 Consent Decree |
| *U.S. v. Lehigh Cement Company LLC,* No. 5:19-cv-05688 (E.D. Pa.) | **$1,300,000** for failure to obtain preconstruction permits and install NOx and SO2 control technology at cement plants. | Approx. 13 years | December 2019 Consent Decree |
| *U.S. v. R.M. Packer Company, LLC*, 2019 WL 4770666 (D. Mass. Sept. 2019). | **$1,300,000** for leaks of hazardous vapors from marine vessel tank and hazardous vapor leaks from above-ground storage tanks. | Not specified | September 2019 Judicial Order[3] |
| *U.S., et al. v. Anchor Glass Container Corp.*, No. 3:18-cv-943 (M.D. Fla.) | **$1,100,000** for failure to obtain pre-construction permits and install and operate appropriate NOx, SO2, and PM control technology. | 3 years (2011-2014) | August 2018 Consent Decree |

---

[3] *U.S. v. R.M. Packer Company, LLC*, Nos. 1:16-10767, 1:16-10769, 2019 WL 4770666 (D. Mass. Sept. 30, 2019).