1
2
3
4                    IN THE UNITED STATES DISTRICT COURT
5                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
6

7   ATHLETICS INVESTMENT GROUP,          Case No.  21-cv-05246-MMC
    LLC,
8                                         **MEMORANDUM OF DECISION;**
                   Plaintiff,             **FINDINGS OF FACT AND**
9                                         **CONCLUSIONS OF LAW**
              v.
10
    SCHNITZER STEEL INDUSTRIES,
11  INC.,

12                 Defendant.

13          In this action, plaintiff Athletics Investment Group, LLC ("AIG") alleges defendant

14  Schnitzer Steel Industries, Inc. ("Schnitzer") is operating a facility located in Oakland,

15  California, in violation of the Clean Air Act ("CAA").  From November 12, 2024, through

16  November 21, 2024, the Court conducted a bench trial on AIG's claims against Schnitzer,

17  and, on March 12, 2025, and March 22, 2025, heard closing arguments.  R. James

18  Slaughter, Travis Silva, Rylee Kercher Olm, Amy Philip, Deeva V. Shah, and Eric H.

19  MacMichael of Keker, Van Nest & Peters LLP, and William M. Sloan and Tyler G. Welti of

20  Venable LLP, appeared on behalf of AIG.  Ronald E. Van Buskirk, Margaret Rosegay,

21  Matthew W. Morrison, Andrew D. Lanphere, Aaron Stuart Dyer, Stacey C. Wright, Eric

22  Moorman, and Cara M. MacDonald of Pillsbury Winthrop Shaw Pittman LLP appeared on

23  behalf of Schnitzer.

24          Having fully considered the evidence presented at trial and the arguments of

25  counsel,[1] the Court hereby sets forth its findings of fact and conclusions of law.

26

27          _____

            [1] The Court has also considered the parties' respective filings of September 19,
28  2025.

## BACKGROUND

Defendant Schnitzer, an Oregon corporation, owns a scrap metal recycling facility located at 1101 Embarcadero West in Oakland, California (hereinafter, "the Facility"). (See Compl. ¶ 14; Answer ¶ 14.)  The Facility is approximately 26 acres in size and is located next to the San Francisco Bay.  (See Transcript of Bench Trial Proceedings ("Tr.") 755:8-12.)  At the Facility, Schnitzer operates the largest metal shredder in California (see Compl. ¶ 14; Answer ¶ 14), which it began operating in 2006 (see Stipulated Fact No. 4).[2]

The Facility receives "heavy iron, auto bodies, appliances, and other light iron," as well as "metal scrap."  (See Ex. YY at 4.)  The operations conducted at the Facility include the following: "shredding end-of-life automobiles, appliances, and other recyclable metal-containing items; shearing recyclable metals; preparing and sorting ferrous and non-ferrous metal recycling feedstock; stockpiling of unprocessed feedstock, metal shredder aggregate (partially sorted shredder output) and processed metal."  (See Ex. 185 at 5.)

Some material received by the Facility, such as "crushed automobiles" and "light iron," is placed into the shredder (see Tr. 289:7-9) and, when shredded, falls through "grates" at the bottom of the shredder onto a conveyer belt (see Tr. 892:13-893:4).  The shredded material then travels by the conveyor belt through a "magnetic drum separator," which separates shredded "ferrous iron" from shredded "non-ferrous raw" ("NFR") material.  (See Tr. 883:9-17.)  The ferrous iron then travels by another conveyor belt to a stockpile referred to as "the shred pile," where the ferrous iron remains until it is "loaded on a ship for transport to an overseas customer."  (See Tr. 883:5-14, 883:25-894:3.)  The NFR material travels by a different conveyor belt to another stockpile, referred to as an NFR stockpile.  (See Tr. 893:15-21.)  The NFR material is then taken by "a loader bucket

---

[2] The parties' Stipulated Facts were read into the record on the first day of trial. (See Tr. 79:8-81:23.)

2

or a dump truck" to the Facility's "joint products plant," in which "a collection of equipment" separates "non-ferrous metals," which are placed in shipping containers and "trucked off the site" (see Tr. 894:161-895:8), from "non-metallic material" (see Tr. 895:1-2), which is "treated with chemicals and shipped offsite for use as alternative daily landfill cover" (see Ex. YY at 4).

Material received by the Facility that is too large or thick to be processed through the shredder, namely, "i-beams" and "large steel scrap of all varieties," is placed into a "heavy melting steel" ("HMS") stockpile. (See Tr. 289:16-18, 20-21, 899:9-15.) Such material is then either "cut in a process called torch cutting" or is "sheered," and the resulting cut material is moved to another HMS stockpile located near the Facility's dock, from where it is placed onto a ship for transport elsewhere. (See Tr. 289:16-25, 899:16-890:1.)

Plaintiff AIG, which owns and operates the major league baseball team formerly known as the Oakland Athletics, has its headquarters at 55 Harrison Street in Oakland, California (see Stipulated Fact Nos. 2-3), a location approximately one mile from the Facility (see Tr. 94:15-16). AIG alleges that, in conducting the above-referenced activities at the Facility, Schnitzer "emit[s] hundreds of tons of hazardous pollutants every year" (see Compl. ¶ 2) and that its "emissions have caused light fibrous material ('LFM')," a substance that "includes a toxic amalgam of hazardous substances," to be "deposited on and around [AIG's] property" (see Compl. ¶¶ 13, 69).

In the Complaint, filed July 7, 2021, AIG asserts against Schnitzer four Claims for Relief under the CAA. In the First Claim for Relief, AIG alleges Schnitzer is operating the Facility in violation of Title V of the CAA, which Title applies to facilities that have a potential to emit large amounts of regulated pollutants. In the Second Claim for Relief, AIG alleges Schnitzer has failed to comply with regulations AIG contends require Schnitzer, in connection with its operation of the shredder, to install the "Best Available Control Technology" ("BACT"). In the Third Claim for Relief, AIG alleges Schnitzer has failed to operate the shredder in compliance with permits to operate ("PTOs") issued by

United States District Court
Northern District of California

1  the Bay Area Air Quality Management District ("BAAQMD"), a government entity that

2  regulates Schnitzer's operations.  Lastly, in the Fourth Claim for Relief, AIG alleges the

3  stockpiles and torch cutting activities are sources of air pollution and that Schnitzer must,

4  and does not, have PTOs for those sources.  As relief, AIG seeks both statutory penalties

5  and an injunction requiring compliance with the CAA.

6  **DISCUSSION**

7  Under the CAA, "any person may commence a civil action on his own behalf . . .

8  against any person . . . who is alleged to have violated (if there is evidence that the

9  alleged violation has been repeated) or to be in violation of (A) an emission standard or

10  limitation under this chapter or (B) an order issued by the Administrator or a State with

11  respect to such a standard or limitation."  See 42 U.S.C. § 7604(a).  "The district courts

12  . . . have jurisdiction, without regard to the amount in controversy or the citizenship of the

13  parties, to enforce such an emission standard or limitation, or such an order, . . . and to

14  apply any appropriate civil penalties."  Id.

15  **A. Standing**

16  At the outset, the Court considers whether AIG has standing to seek relief under

17  the CAA.

18  To have Article III standing, a plaintiff must have an "injury in fact," i.e., "an

19  invasion of a legally protected interest that is concrete and particularized and actual or

20  imminent," see Spokeo, Inc. v. Robins, 578 U.S. 330, 338-39 (2016) (internal quotations

21  and citation omitted), and that such injury "is fairly traceable to the challenged conduct of

22  the defendant," see id. at 338.  Additionally, the plaintiff must show that any such injury

23  "is likely to be redressed by a favorable judicial decision."  See id.

24  Here, AIG relies on three theories in support of its argument that it has standing:

25  trespass, increased health risks, and expenditures.  The Court next considers each such

26  theory in turn.[3]

27  _____

28  [3] Initially, when it filed its Complaint, AIG relied on a fourth theory, namely, its then-existing plan to "build a ballpark for Major League Baseball games and other events in

4

United States District Court
Northern District of California

**1. Trespass**

AIG first seeks to base standing on a showing that emissions from the Facility have "physically intrude[d]" onto AIG's property in the form of LFM, in other words, that "a trespass" has occurred.  (See Pl.'s Proposed Findings of Fact and Conclusions of Law ("Pl.'s Proposed Findings") at 33:5-6, 18-20.)

"[T]respass is a type of injury that has been litigated in court for centuries," see CHKRS, LLC v. City of Dublin, 984 F.3d 483, 489 (6th Cir. 2021), and is cognizable as an injury even in the absence of "any consequential damages," see Rodriguez v. El Toro Medical Investors Ltd. Partnership, 2016 WL 6804394, at *5 (C.D. Cal. November 16, 2016) (noting, "at common law, one commits a trespass by stepping on even a single blade of grass on the property of another, regardless of whether the property owner realizes the intrusion or suffers actual harm"); see also Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (observing, "in environmental cases," Article III injury "can be demarcated as a traditional trespass on property").

LFM has been described by the California Department of Toxic Substances Control ("DTSC") as "waste that typically consists of residues from metal shredding operations such as glass, rubber, automobile fluids, dirt, and plastics from shredded dashboards, car seats, and other non-metallic car parts and household appliances," which waste "has the potential to become airborne and migrate offsite."  (See Ex. 185 at 6.)  LFM is "created through the pulverization of auto bodies or end-of-life vehicles that are fed into the shredder."  (See Tr. at 170:13-15.)

It is undisputed that LFM created at the Facility contains "pollutants" regulated by the CAA.  (See Tr. at 180:23-25, 773:14-21.)  Additionally, it is undisputed that the

_____

close proximity to the Facility."  (See Compl. ¶ 13.)  Prior to trial, however, AIG withdrew that additional theory (see Doc. No. 73 at 4 (stating AIG "will not rely on . . . the possibility of building a baseball stadium [near the Facility] as a basis for standing") (emphasis in original)), as "[t]he A's [had] played their final game in Oakland" (see Tr. 134:5-7) and "will not be playing baseball in Oakland" in the future (see Tr. 84:1-4).

United States District Court
Northern District of California

Facility's shredder is a source of LFM, as are its NFR stockpiles (see Tr. 170:13-15, 170:20-171:6, 773:3-13, Ex. 130 at 3, Ex. 197 at 2), and that the Facility "disperse[s] LFM off-site" (see Tr. 1265:4-1265:1).

The parties disagree, however, as to whether LFM from the Facility has migrated to AIG's headquarters on 55 Harrison Street, a property AIG began leasing prior to the date on which the Complaint was filed and continues to lease (see Tr. at 94:25-95:1, 96:5-8, Ex. 22), and which, as noted, is located approximately one mile from the Facility. In that regard, the Court finds persuasive the testimony of Andrew Safford, who testified that his company, EKI Environment, collected LFM samples at 55 Harrison Street in both 2019 and 2023, as well as at an immediately adjacent parking garage in 2019,[4] that he compared those samples to LFM samples known to have been dispersed from the Facility, and that he found the two sets of samples were a match (see Tr. at 164:25, 181:4-182:2,185, 188:11-190:10, 192:22-193:1, 193:19-196:6, 201:15-202:24, 204:7-208:24, Ex. 384), or, as he described it, that the two sets of samples had "the same fingerprint" (see Tr. at 195:2-3).  In light of such testimony, the Court finds LFM was present at 55 Harrison Street both before and after the Complaint was filed and that said LFM came from the Facility.[5]

Given the above circumstances, the Court finds AIG has suffered an injury caused by Schnitzer, namely, the above-described trespass by LFM.  Further, given that the shredder, although now enclosed, has "draft openings" (see Tr. at 767:6-7), that the NFR stockpiles remain "uncovered" (see Tr. at 757:24-758:7, Ex. 192), and that Schnitzer, as of the time of trial, was continuing to send "cleaning crews" into the neighboring areas to "clean up releases of LFM" (see Tr. 772:25-773:2), the Court finds AIG is "likely to suffer

---

[4] AIG's lease includes the use of 119 spaces in a parking structure located at 255 Second Street and connected to 55 Harrison Street by an aerial bridge.  (See Tr. 117:21-118:15.)

[5] The next closest "auto shredder" is located in Redwood City, California (see Tr. at 773:22-774:1), a city situated a considerable distance from Oakland and on the other side of San Francisco Bay.

future injury," see City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983) (setting forth showing needed to have standing to seek injunctive relief), namely, trespass in the form of LFM that contains pollutants regulated by the CAA.

With respect to the issue of whether such injury would be redressable by a judgment in favor of AIG, the Court finds the injunctive relief requested by AIG, namely, an order enjoining further operation of the shredder, requiring Schnitzer to fully enclose the shredder, and/or requiring NFR stockpiles to be covered, could redress the claimed injury and is available under the CAA.  See Grand Canyon Trust v. Tucson Electric Power Co., 391 F.3d 979, 985 (9th Cir. 2004) (finding § 7604(a) "empower[s] citizens to bring suit for injunctive relief").  Additionally, as the Supreme Court has recognized, statutory penalties, by deterring the commission of future violations, "afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct."  See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 185-86 (2000).

The remaining question is whether, as a result of the trespass, AIG has standing to assert each of the four Claims for Relief.  See Davis v. Federal Election Comm'n, 554 U.S. 724, 7347 (2008) (holding, as "standing is not dispensed in gross," a plaintiff "must demonstrate standing for each claim he seeks to press") (internal quotations, citations, and alteration omitted).  The Court finds AIG has standing to bring the First, Second, and Third Claims for Relief, each of which challenges Schnitzer's operation of the shredder, and the Fourth Claim for Relief to the extent it challenges Schnitzer's operation of NFR stockpiles.

To the extent the Fourth Claim for Relief challenges Schnitzer's operation of non-NFR stockpiles or its torch cutting operations, however, AIG fails to cite any evidence, and the Court has located none, to support a finding that LFM is generated by stockpiles other than NFR stockpiles or by torch cutting.  In short, AIG has failed to show the trespass of LFM is caused by those other types of operations at the Facility, and, consequently, any standing it has to challenge those operations must be based on

another theory. The Court thus considers next whether AIG's additional arguments suffice to support its standing to pursue the remaining portions of the Fourth Claim for Relief.

### 2. Increased Health Risks to Employees

AIG seeks to base standing on a showing that emissions from the Facility "increase the health risks for individuals" who work for AIG. (See Pl.'s Proposed Findings at 34:13-14.) An employer, however, can base its standing on injuries to its employees under very limited circumstances. In particular, the employer must demonstrate that, in addition to showing the employee has suffered an injury in fact, there exists a "genuine obstacle" to such employee's asserting his/her own rights. See Viceroy Gold Corp. v. Aubry, 75 F.3d 482, 488-89 (9th Cir. 1996) (holding employee's "lack of motivation" because he/she lacks "a sufficient individual economic stake in the outcome" is insufficient to show "genuine obstacle"). Here, AIG fails to show, or even discuss, why its employees face some type of obstacle to bringing suit based on their own asserted increased health risks.

Accordingly, AIG fails to show it has standing based on asserted increased health risks to its employees.

### 3. Expenditures

AIG also seeks to base standing on its having "spent money as a result of Schnitzer's emissions" (see Pl.'s Proposed Findings at 35:17-19), in particular, its payment of "[a]bout a hundred thousand dollars" to third parties for tasks "unrelated to this litigation" (see Tr. at 87:6-20). Specifically, AIG has submitted evidence that it previously was "interested in developing a ballpark at the Howard Terminal site," which development would have required it to complete an "environmental impact report" ("EIR"), and, in preparation therefor, it expended funds to conduct "an extensive amount of diligence on the site itself, and also [on] understanding the neighboring properties," which included the Facility. (See Tr. at 86:9-87:5.)

//

As the Supreme Court recently explained, however, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." See Food and Drug Administration v. Alliance for Hippocratic Medicine, 602 U.S. 367, 394 (2024).  Thus, the issue is whether, at the time AIG expended funds to prepare its then-anticipated EIR, AIG did so because it had "suffered a concrete injury caused by" Schnitzer's operation of non-NFR stockpiles or torch cutting.

In Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998), the Supreme Court provided an example of a plaintiff that suffered an injury in fact by reason of an expenditure of funds for the purpose of investigation.  In particular, the plaintiff asserted therein a claim based on the defendant's alleged failure to comply with a federal statute the plaintiff contended required the defendant to complete forms detailing the nature of "toxic and hazardous chemicals" at the defendant's facility.  See id. at 86-87.  The Supreme Court held the plaintiff suffered an "Article III" injury by reason of its having incurred, prior to filing its lawsuit and "unrelated" thereto, costs to "dig[ ] up the emissions and storage information that [the defendant] should have filed, and that [the plaintiff] needed for its own purposes."  See id. at 107-08.

Here, although AIG likewise sought information for its "own purposes," see id., namely, information to include in an EIR, the record does not suggest Schnitzer failed to provide information it statutorily was required to provide or otherwise engaged in conduct that increased the costs of AIG's pre-litigation investigation.  Rather, the record indicates AIG, in preparation for an EIR, investigated the Facility because AIG was required to investigate all neighbors of the Howard Terminal site, irrespective of the type of business in which those neighbors engaged.  Consequently, AIG has failed to show its pre-litigation investigation of Schnitzer constitutes an Article III injury.

Even if AIG's expenditure of the portion of the costs it expended to prepare an EIR attributable to its investigation of Schnitzer can be considered an Article III injury, however, a plaintiff has standing to sue only when its "requested relief will redress the

United States District Court
Northern District of California

United States District Court
Northern District of California

1   alleged injury." See id. at 103.  In Steel Co., the Supreme Court found the costs incurred

2   by the plaintiff to conduct its pre-litigation investigation of the defendant, although

3   sufficient to constitute an Article III injury, nonetheless were insufficient to support

4   standing.  In so holding, the Supreme Court explained that, although the statute under

5   which the plaintiff sought relief did provide for the recovery of "costs of litigation," there

6   was no provision making pre-litigation expenses that were unrelated to the litigation

7   "reimbursable," see id. at 108, and, consequently, that the plaintiff was unable to show

8   "the relief [it] sought . . . would likely remedy its alleged injury in fact," see id. at 109

9   (holding plaintiff "lack[ed] standing to maintain [its] suit").

10      Here, similarly, the CAA, the statute under which AIG proceeds, does not provide

11  for the recovery of costs unrelated to the litigation; rather, the only financial recovery

12  available to a plaintiff under the CAA is set forth in § 7604, which provides that a court

13  "may award costs of litigation (including reasonable attorney and expert witness fees)."

14  See 42 U.S.C. § 7604(d).  Consequently, as investigatory expenses unrelated to the

15  litigation are not recoverable under the CAA, any Article III injury in fact existing by

16  reason of the expenditures on which AIG relies cannot be remedied by the instant action.

17      Accordingly, AIG fails to show it has standing based on its expenditures to

18  investigate Schnitzer.[6]

19      **4. Conclusion:  Standing**

20      For the reasons stated above, the Court finds AIG has Article III standing to

21  pursue its First, Second and Third Claims for Relief, as well as its Fourth Claim for Relief

22  to the extent AIG challenges Schnitzer's operation of NFR stockpiles, but that, in all other

23  respects, it lacks standing to pursue its Fourth Claim for Relief.

24  //

25  //

26

27      [6] AIG does not seek to base its standing on costs incurred in connection with the
    instant action.  See Steel Co., 523 U.S. at 108 (holding "costs of litigation cannot alone
28  support standing").

**B.  Liability**

The Court next considers in turn the four Claims for Relief.

**1.  First Claim for Relief**

Under Title V of the CAA, it is "unlawful" to "operate . . . a major source . . . except in compliance with a permit issued by a permitting authority."  See 42 U.S.C. § 7661a(a).  Under rules promulgated by BAAQMD, any "major facility," the term BAAQMD uses to refer to a facility required to obtain a Title V permit, is defined as one with the "potential to emit" (1) "100 tons per year or more of any regulated air pollutant except total suspended particulate," (2) "10 tons per year or more of a single hazardous air pollutant ['HAP']" or (3) "25 tons per year or more of a combination of [HAPs]," see BAAQMD Rule 2-6-212.[7] When such potential exists, the operator has one year to submit an application for a Title V permit.  See BAAQMD Rule 2-6-404 (providing "initial application for a major facility review permit" must be submitted "within 12 months after the facility becomes subject to BAAQMD's permit program"); see also 42 U.S.C. § 7661b(c) (providing "[a]ny person required to have a [Title V] permit shall, not later than 12 months after the date on which the source becomes subject to a permit program," submit "application for a permit").

AIG asserts that the Facility, as a result of the shredder's potential to emit pollutants, is a "major source" and a "major facility," within the meaning of the CAA and the above-quoted BAAQMD rules, and that Schnitzer, by failing to obtain a Title V permit, has violated the CAA.  The evidence offered at trial relevant to AIG's claim is as follows.

//

_____

[7] The CAA requires States to submit to the Environmental Protection Agency ("EPA") "State Implementation Plans ('SIPs')" that "propose[ ] methods for maintaining air quality."  See Safe Air For Everyone v. EPA, 488 F.3d 1088, 1091 (9th Cir. 2007).  When approved by the EPA, SIPs "have the force and effect of federal law."  See id. (internal quotation, citation, and alteration omitted).  Under California law, "local and regional authorities have the primary responsibility for control of air pollution," see Cal. Health & Safety Code § 40000, including BAAQMD, which has jurisdiction over Alameda County, see Cal. Health & Safety Code § 40200, the County in which the Facility is located.  BAAQMD has promulgated a number of rules that are included in the California SIP, and, consequently, those rules are "_federal_ law, not _state_ law."  See Safe Air For Everyone, 488 F.3d at 1097 (emphasis in original).

United States District Court
Northern District of California

1  In February 2006, Schnitzer applied for a PTO for a new shredder to replace an

2 older shredder that had "worn out."  (See Ex. 86 at 055.)  In November 2006, Schnitzer

3 began operating the new shredder (see Stipulated Fact No. 4), and, in April 2007,

4 received from BAAQMD a PTO that limited the shredder's "throughput" to 431,471 tons

5 per calendar year (see Stipulated Fact No. 5).  On April 14, 2009, Schnitzer "increased

6 the . . . shredder's permitted throughput to 720,000 tons in a calendar year," as allowed

7 by another PTO it had obtained.  (See Stipulated Fact No. 6.)  In connection with its

8 application to increase the shredder's throughput, Schnitzer, in 2007, had conducted

9 "source tests" (see Ex. 28 at 700), and, based on the results, told BAAQMD the potential

10 emissions from the increased throughput would be below the potential that would require

11 Schnitzer to apply for a Title V permit (see Ex. 184 at 850).

12  Between 2009 and 2017, there were "no modifications" to the shredder.  (See

13 Stipulated Fact No. 7.)  Thereafter, in 2017, Schnitzer, having applied for and received a

14 permit to build an "enhanced capture system" and an "enclosure around the shredder,"

15 as well as an "upgraded PM ['Particulate Matter'] emission control system," completed

16 those improvements.  (See Stipulated Fact Nos. 8-9.)  After Schnitzer completed the

17 enclosure and installed the other improvements in May 2017, it conducted, in October of

18 that year, "source tests" that showed the shredder's potential to emit regulated air

19 pollutants exceeded 100 tons per year (see Ex. 254 at 7, 10), after which, in October

20 2018, it applied for a Title V permit (see Stipulated Fact No. 10).  Additionally, based on

21 the results of further source tests completed in January 2019, Schnitzer determined the

22 shredder, even after the above-described improvements, was actually emitting more than

23 25 tons per year of HAPs.  (See Tr. at 1136:21-24.)[8]

24 //

25 //

26

27 _____

28  [8] As of the last date on which closing arguments were made, BAAQMD had not
rendered a decision on Schnitzer's application for a Title V permit.

United States District Court
Northern District of California

1       In light of the above, including the Stipulated Fact that there were no modifications

2    between 2009 and 2017, the Court finds the results obtained from the 2017 and 2019

3    source tests are indicative of the circumstances that existed in 2009, and that Schnitzer

4    did not apply for a Title V permit in 2010, as required under the CAA.

5       Schnitzer contends its 2018 application nonetheless was timely, on the asserted

6    ground that it lacked knowledge of the need for a Title V permit until it obtained the

7    results of the source tests it conducted after it built the current enclosure around the

8    shredder, and that it applied for a Title V permit within one year of obtaining such

9    knowledge.  As set forth below, the Court, contrary to Schnitzer's argument, finds liability

10    under § 7661a(a) is strict liability.

11       No section of the CAA, including § 7661a(a), contains any language requiring

12    knowledge or any other state of mind on the part of the operator, which omission, the

13    Court finds, is not an oversight but, rather, an integral part of the CAA.  In that regard, the

14    Ninth Circuit, in finding "a strict liability standard" applicable to a violation of another

15    section of the CAA, relied on legislative history pertaining to the CAA as a whole.  <u>See</u>

16    <u>United States v. Trident Seafoods Corp.</u>, 92 F.3d 855, 861 (9th Cir. 1996).  In particular,

17    the Ninth Circuit cited a congressional report stating that, "where protection of the public

18    health is the root purpose of a regulatory scheme (such as the Clean Air Act), persons

19    who own or operate pollution sources in violation of such health regulations must be held

20    strictly accountable," that "[a]ny other rule would make it in the owner or operator's

21    interest not to have actual knowledge of the manner of operation of the source," and that

22    "any argument about the violator's knowledge, intent, negligence, or culpability [can] be

23    considered by the courts in deciding how much to fine any violator, rather than in

24    determining whether any enforcement action can be brought in the first place."  <u>See</u> 1977

25    U.S.C.C.A.N. 1077, 1148 (1977); <u>see also</u> <u>United States v. B&W Investment Properties</u>,

26    38 F3d 362, 364 (7th Cir. 1994) (holding CAA "impose[s] strict liability on violators").

27       The Court next considers Schnitzer's argument that AIG lacks statutory standing to

28    seek relief to the extent predicated on Schnitzer's submission of an untimely Title V

application.  In support of such argument, Schnitzer relies on BAAQMD Rule 2-6-407.

The cited Rule, titled "Application Shield," provides:

> A facility shall not be subject to enforcement action for not possessing a
> major facility review permit if the facility fulfills the following three conditions:
>
>> The facility has filed with the APCO a complete and timely
>> application for an initial major review permit or for a five-year renewal
>> of an existing major facility review permit;
>>
>> The APCO has not acted on the application; and
>>
>> The facility has honored all requests from the APCO for further
>> information relating to the application by the date specified in writing
>> of the request.
>
> If the facility has not submitted a timely and complete application, the period
> of non-compliance shall be the period between the submittal deadline and
> the actual submittal.

See BAAQMD Rule 2-6-407.[9]

Although the Court has found the Title V application Schnitzer submitted in

October 2018 was untimely, the Court further finds, in light of the last sentence in Rule 2-

6-407, Schnitzer's "period of non-compliance" ended in October 2018.[10]  As set forth

below, this finding precludes AIG's prevailing on its first claim.

Where a CAA claim filed by a private party is not based on a claim that the

defendant has engaged in a past violation that "has been repeated,"[11] the claim must be

based on a showing that the defendant is "in violation," see 42 U.S.C. § 7604(a)(1),

namely, that the violation is "ongoing" at the time the complaint is filed, see Nucor Steel-

Arkansas v. Big River Steel, LLC, 825 F.3d 444, 450 (8th Cir. 2016).  Here, AIG contends

Schnitzer's operation without a Title V permit is a continuing violation, in that, as of the

date the Complaint was filed, it lacked such permit.  Under Rule 2-6-407, however,

---

[9] The "APCO" referenced in the quoted rule is an official of BAAQMD, namely, the "Air Pollution Control Officer" or the "designee thereof."  See BAAQMD Rule 1-203.

[10] There is no dispute that said application is "complete."  (See Ex. GGG.)

[11] Schnitzer does not allege in the Complaint and did not offer any evidence at trial that Schnitzer has engaged in repeated violations of the requirement to obtain a Title V permit for the Facility.

1  Schnitzer's period of non-compliance under Title V ended when Schnitzer submitted its

2  untimely application for a Title V permit in October 2018.

3       To avoid such finding, AIG contends Rule 2-6-407, unless interpreted as placing a

4  limit only on enforcement action taken by BAAQMD, would be inconsistent with the

5  permit application shield statute contained in 42 U.S.C. § 7661b(d).

6       Section 7661b(d), included in the CAA, provides a shield only to applicants who

7  have submitted a "timely" application, and reads, in relevant part, as follows:

8       [I]f an applicant has submitted a timely and complete application for a
     permit required by [Title V], but final action has not been taken on such

9       application, the source's failure to have a permit shall not be a violation of
     [the CAA], unless the delay in final action was due to the failure of the

10      applicant to submit information required or requested to process the
     application.

11 See 42 U.S.C. § 7661b(d).

12      In support of its argument, AIG relies on the principle that, where a federal law and

13 state law are in conflict, the federal law must prevail, a principle applicable to conflicts

14 between the CAA and state law.  See Natural Resources Defense Council, Inc. v. EPA,

15 478 F.3d 875, 888 (1st Cir. 1973) (holding "Congress plainly intended the [CAA] and

16 regulations promulgated thereunder to take precedence over state laws and

17 regulations").  Although not expressly articulated, AIG appears to be arguing Rule 2-6-

18 407 can only be saved by construing it in the limited manner AIG proposes.

19      The principal on which AIG relies, however, is inapplicable.  As explained above,

20 see n.7, if the EPA approves a BAAQMD Rule, that Rule is a "*federal* law, not [a] *state*

21 law," see Safe Air For Everyone, 488 F.3d at 1097 (emphasis in original), and,

22 consequently, Rule 2-6-407 is a federal law, said Rule having been approved by the EPA

23 in 2001, see 66 Fed. Reg. 53140, 53145, Table 1A (October 19, 2021) ("Proposed Rule"

24 listing Rule 2-6-407, titled "Application Shield," among rules EPA plans to approve); 66

25 Fed. Reg. 63503, 63503-04 (December 7, 2001) ("Final Rule" granting "full approval" of

26 all BAAQMD Rules listed in "Proposed Rule" filed October 19, 2021).

27 //

28

1    Moreover, contrary to AIG's argument, § 7661b(d) and Rule 2-6-407 do not appear

2  to be in conflict, as the latter addresses a topic on which the former is silent, namely,

3  when a violation of Title V's permit-filing requirement ends.  Indeed, the EPA, having

4  approved § 7661b(d), necessarily found such Rule is not in conflict with § 7661b(d) or

5  any other provision in the CAA, and no claim has been made, and cannot be made, in the

6  instant action, that the EPA erred in approving Rule 2-6-407.[12]

7    In sum, Schnitzer's period of non-compliance with Title V having ended in October

8  2018, and the violation not being repeated or ongoing, AIG lacks statutory standing to

9  bring the First Claim for Relief.

10    Accordingly, Schnitzer is entitled to judgment in its favor on the First Claim for

11  Relief.

12    **2.  Second Claim for Relief**

13    Under the CAA, a SIP "shall provide that permits to construct and operate may be

14  issued if . . . the proposed source is required to comply with the lowest achievable

15  emission rate."  See 42 U.S.C. §  7503(a)(2).  BAAQMD's implementation of such

16  requirement, as applied to a permit to operate for a modified source, is set forth in Rule 2-

17  2-301, which provides that such permit "shall require BACT to control emissions of each

18  District BACT pollutant . . . for which . . . the source, after the modification, will have the

19  potential to emit that pollutant in an amount of 10.0 or more pounds on any day" and "the

20  modification will result in an increase in emissions of that pollutant above baseline levels

21  calculated pursuant to Section 2-2-604."[13]  See BAAQMD Rule 2-2-301.

22    AIG asserts that Schnitzer, beginning in 2009, the year it received a permit to

23

24    [12] A claim that the EPA erred in approving a rule promulgated by a state agency
for inclusion in a SIP must be brought against the EPA in an appropriate Court of
25  Appeals.  See 42 U.S.C. § 7607(b) (providing action challenging "final action of [EPA] . . .
which is locally or regionally applicable may be filed only in the United States Court of
26  Appeals for the appropriate circuit"); see also, e.g., Montana Environmental Information
Center v. Thomas, 902 F.3d 971 (9th Cir. 2018) (considering merits of petition for review
27  filed in Ninth Circuit asserting EPA erred in approving provision in Montana SIP).

28    [13] The method for calculating an increase in emissions is not at issue here.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    increase the throughput of the shredder, has failed to implement BACT for precursor

2    organic compounds ("POCs"), which are defined by BAAQMD as "District BACT

3    pollutants."  See BAAQMD Rule 2-2-210.

4        As noted above, Schnitzer filed an application to increase the throughput of the

5    shredder.  Specifically, in September 2007, Schnitzer applied for a permit to operate the

6    shredder with "an increase in annual scrap throughput" (see Ex. 28 at 693), namely, an

7    increase from "431,471 tons in any consecutive 12-month period," the limit in the then-

8    current PTO, to "720,000 tons per calendar year" (see Ex. 28 at 696).  In its application,

9    Schnitzer, in estimating the potential emissions from the proposed increase, relied, as

10   discussed above, on the tests it conducted in 2007.  (See Ex. 28 at 700-703).  When

11   BAAQMD approved the application and issued the permit in 2009, it determined BACT

12   for "volatile organic compounds" was "triggered," but further determined BACT, which

13   BAAQMD described as "a fixed-bed carbon adsorption system," along with "ductwork and

14   blowers," was "not cost-effective," and, consequently, did not require BACT for "POC

15   emissions."[14]  (See Ex. 184 at 846, 851-52, 854-55.)[15]

16       AIG asserts BAAQMD's 2009 BACT determination was incorrect due to

17   Schnitzer's having submitted with its application the 2007 test results that did not

18   accurately reflect the shredder's potential to emit pollutants.  In support of such theory,

19   AIG, at trial, established that the results of source tests performed in 2017 after the

20   shredder had been enclosed showed potential POC emissions were "more than 25

21   percent higher" than the results of the source tests performed in 2007.  (See Tr. 716:13-

22   717:11.)

23       Next, based on such higher figure, AIG argues a different BACT determination

24

25       [14] In the permit, BAAQMD appears to use the terms "volatile organic compounds"
     and "POC[s]" interchangeably.

26
27       [15] At that time, BAAQMD did require BACT for "PM" emissions, namely, "the use of
     water injection, cyclones, scrubber, filter, and demister arranged in series with an exhaust
     PM loading of 0.01 gr/dscf or less" (see Ex. 184 at 851), a determination not at issue
28   here.

1   would have been made.  In that regard, AIG's expert, Matt Haber ("Haber"),[16] testified

2   that, using the results of the 2017 source tests, it is his opinion that, for POCs, BACT at

3   the time BAAQMD made the challenged BACT determination, was a "regenerative

4   thermal oxidizer ['RTO']" used in "a complete enclosure . . . effective in capturing all the

5   emissions from a source within it," i.e., an enclosure that meets the specifications of

6   "EPA Method 204."  (See Tr. 385:4-25).[17]  Haber explained that an RTO "burns" POCs

7   "by passing them through a chamber where temperatures are high enough to cause the

8   breakdown of the POCs" (see Tr. 385:10-13), but that utilizing an RTO without a Method

9   204 enclosure would be "meaningless" because a Method 204 enclosure is necessary to

10  "capture" and "send" the emissions to the RTO (see Tr. 388:23-389:5).

11      As defined by BAAQMD, BACT is "[a]n emission limitation, control device, or

12  control technique applied at a source that is the most stringent of" the following four

13  alternatives:  (1) "[t]he most effective emission control device or technique that has been

14  successfully utilized for the type of equipment comprising such a source"; (2) "[t]he most

15  stringent emission limitation achieved by an emission control device or technique for the

16  type of equipment comprising such a source"; (3) "[t]he most effective control device or

17  technique or most stringent emission limitation that the APCO has determined to be

18  technologically feasible for a source, taking into consideration cost-effectiveness, any

19  ancillary health and environmental impacts, and energy requirements"; or (4) "[t]he most

20  effective emission control limitation for the type of equipment comprising such a source

21  that is contained in an approved implementation plan of any state, unless the applicant

22  demonstrates to the satisfaction of the APCO that such limitation is not achievable."  See

23  BAAQMD Rule 2-2-202.

24      Here, AIG relies only on the first and third of the above-referenced four

25

26      _____

27      [16] AIG does not seek a determination that BACT consists of any device, technique, or limitation other than that proposed by Haber.

28      [17] Method 204 is codified at 40 C.F.R. Appendix M to Part 51.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    alternatives.  (See Pl.'s Proposed Findings at 52:10-53:11.)  AIG has failed, however, to

2    offer evidence that establishes the use of RTOs in a Method 204 enclosure falls within

3    either.[18]

4        The first alternative requires a showing that the use of RTOs in a Method 204

5    enclosure has been "successfully utilized" with a shredder.  Although Haber testified he

6    was aware some shredding facilities have utilized RTOs (see Tr. 388:3-16) and that other

7    shredding facilities have Method 204 enclosures (see Tr. 389:6-10), he also testified he

8    did not know whether any of those facilities had utilized RTOs in a Method 204 enclosure

9    (see Tr. 497:5-8, 500:1-501:14), and, as noted above, he opined that utilizing RTOs

10   without a Method 204 enclosure would be "meaningless," nor has he offered any opinion

11   suggesting the use of such an enclosure in the absence of RTOs would be beneficial, let

12   alone constitute BACT.

13       The third alternative is satisfied only by a showing that "the APCO," i.e., a

14   BAAQMD official, has made a determination that a particular device, technique, or

15   emission limitation is "technologically feasible, taking into consideration cost-

16   effectiveness, any ancillary health and environmental impacts, and energy requirements."

17   See BAAQMD Rule 2-2-202.3.  There is no evidence, however, that BAAQMD has ever

18   made a determination that the use of RTOs with a shredder in a Method 204 enclosure

19   meets the requisite standard.  Further, as BAAQMD is not a party to the instant action,

20   the Court has no power to order BAAQMD to determine whether it should have, in 2009

21   or at any other time, concluded the use of RTOs in a Method 204 enclosure constitutes

22   BACT.[19]

23   _____

24       [18] In light of such finding, the Court does not consider herein Schnitzer's alternative
     argument that the Second Claim for Relief is barred by the applicable statute of

25   limitations.

26       [19] In 2016, BAAQMD contemplated that, at a future date, it might "recalculate" the
     "BACT requirements . . . for POC emissions."  (See Ex. 91 at 735.)  Although the record

27   does not indicate BAAQMD ever did so, nothing in the instant order precludes it from
     recalculating BACT, including determining whether any device, technique, or emission

28   limitation is "technologically feasible" for purposes of BAAQMD 2-2-202.

United States District Court
Northern District of California

1   Accordingly, Schnitzer is entitled to judgment in its favor on the Second Claim for

2   Relief.

3   **3. Third Claim for Relief**

4   Pursuant to BAAQMD's rules, "[a] person shall not operate any article, machine,

5   equipment or other contrivance, for which . . . [a] permit to operate has been issued, in

6   violation of any permit condition." <u>See</u> BAAQMD Rule 2-1-307.  AIG asserts that

7   Schnitzer, as of the date on which the Complaint was filed, was not operating the

8   shredder in compliance with Schnitzer's PTO, specifically, with a term setting limits on the

9   amount of POC emissions.

10   The parties agree that the 2020-2021 and 2021-2022 PTOs issued by BAAQMD

11   contained "Condition #27085," which limited the amount of POCs the shredder could emit

12   to "112.0 pounds per hour and 85.0 tons per year" (<u>see</u> Stipulated Fact #16), and that,

13   between November 1, 2020, and April 2022, the shredder's "daily POC emissions

14   exceeded the Condition #27085 limitations" (<u>see</u> Stipulated Fact #17).

15   Although the above-referenced stipulated facts establish a violation of a term in

16   the PTOs, Schnitzer argues it cannot be held liable because, according to Schnitzer, the

17   claim is moot.

18   A claim becomes moot, and "must" be dismissed, when "events in the world

19   overtake those in the courtroom" and the plaintiff "manages to secure outside of litigation

20   all the relief he might have won in it." <u>See</u> <u>FBI v. Fikre</u>, 601 U.S. 234, 240 (2024).  For

21   example, where a plaintiff seeks injunctive relief to end a "challenged practice," a

22   defendant's "voluntary cessation" of the practice moots the claim for injunctive relief if the

23   defendant establishes "the practice cannot reasonably be expected to recur." <u>See</u> <u>id.</u> at

24   241 (internal quotation and citation omitted).

25   Here, Schnitzer relies on the undisputed facts that, in 2019, it applied for and, in

26   2021, received from BAAQMD an "Authority to Construct" ("ACT") permit to construct two

27   //

28   //

20

RTOs and two "acid gas scrubbers,"[20] and that Schnitzer, in April 2022, completed the installation of said devices.  (See Stipulated Facts 12-14.)  Schnitzer also relies on the results of two source tests conducted after the installation of the RTOs and acid gas scrubbers, the first conducted in April 2022 and the second in April 2023, which results showed the POC emissions were significantly less than the limits set in Condition #27085.  (See Ex. WW at 1, 9; Ex. AAAA at 1, 7.)

Although such results arguably would moot a request for an injunction requiring Schnitzer to take action to ensure the shredder's emission of POCs is in an amount lower than that set forth in Condition #27085,[21] AIG does not seek injunctive relief with respect to the Third Claim for Relief, but, rather, only imposition of penalties, a claim that "attaches at the time the violations occur, not at the time of the judgment," and, consequently, is not moot.  See Ecological Rights Foundation v. Pacific Lumber Co., 230 F.3d 1141, 1153 (9th Cir. 2000) (finding Clean Water Act claim challenging defendant's failure to obtain permit not moot where, although defendant obtained requisite permit after complaint was filed, plaintiff's claim for civil penalties "remained viable"; noting civil penalties also serve to "deter future violations").

Accordingly, AIG is entitled to judgment in its favor on the Third Claim for Relief.

### 4. Fourth Claim for Relief

As noted above, AIG, in the Fourth Claim for Relief, challenges the manner in which Schnitzer operates stockpiles and torch cutting activities at the Facility.  As discussed above, however, AIG lacks standing to challenge those activities, other than Schnitzer's use of NFR stockpiles without a permit, which claim the Court next considers.

//

---

[20]  Acid gas scrubbers "control acid gases that can be produced by oxidation of certain chemicals in the RTO[s]."  (See Tr. 874:14-18.)

[21] Nothing in the record suggests Schnitzer will discontinue use of the RTOs and acid gas scrubbers. The ATC permit allowed Schnitzer to install and "initially operate" them (see Tr. 880:15-22), and Schnitzer is waiting for BAAQMD to rule on Schnitzer's application for a PTO for those devices (see Tr. 880:4-13, 881:2-9).

United States District Court
Northern District of California

1    BAAQMD's rules provide that, "[b]efore any person . . . uses or operates any

2 article, machine, equipment or other contrivance, the use of which may cause, reduce or

3 control the emission of air contaminants, such person shall first secure written

4 authorization from the APCO in the form of a permit to operate." See BAAQMD Rule 2-1-

5 302.

6    It is undisputed that the NFR stockpiles are "sources of emissions of air pollutants"

7 and that Schnitzer does not have a permit to operate those stockpiles. (See Stipulated

8 Fact No. 20.) Schnitzer contends, however, an exemption to the permit requirement

9 exists. See, e.g., BAAQMD Rules 2-1-105-128 (identifying numerous exemptions). In

10 particular, Schnitzer relies on two alternative exemptions.

11    First, Schnitzer relies on BAAQMD Rule 2-1-115, which is titled "Exemption,

12 Particulate Sources at Quarries, Mineral Processing and Biomass Facilities" and

13 provides:

14    The following potential PM2.5 and PM10 sources are exempt from the
     requirements of sections 2-1-301 and 302, provided that the source does
15    not require permitting pursuant to Section 2-1-319.

16        115.1  Sources located at . . . [a] vehicle shredding . . . facility which meet[ ]
           one of the following:
17            . . .

18            1.4  Operating, loading and unloading the following sources which
19            process exclusively material with a moisture content greater than or
              equal to 5 percent by weight:
20                1.4.1  Screen or other size classification;
                  1.4.2  Conveyor, screw, auger, stacker or bucket elevator;
21                1.4.3  Grizzly, or other material loading or unloading;
22                1.4.4  Storage silos;
                  1.4.5  Storage or weigh hopper/bin system.
23            1.5    Haul or access roads;
              1.6    Drilling or blasting.
24

25 See BAAQMD Rule 2-1-115.

26    In particular, Schnitzer argues, its NFR stockpiles constitute a "storage or weigh

27 hopper/bin system," see BAAQMD Rule 2-1-115.1.4.5, under a theory that stockpiles

28 constitute a "storage system" (see Def.'s Proposed Findings of Fact and Conclusions of

United States District Court
Northern District of California

Law at 67:17). In other words, Schnitzer interprets the phrase "storage or weigh hopper/bin system" as exempting either a "storage system" or a "weigh hopper/bin system," as opposed to the interpretation proffered by AIG, namely, that the phrase exempts either a "storage hopper/bin system" or a "weigh hopper/bin system," two different types of hopper or bin systems.[22]

In interpretating federal regulations,[23] courts are to apply "all the traditional tools of construction," see Kisor v. Wilkie, 588 U.S. 558, 575 (2019) (internal quotation and citation omitted), one of which is "to avoid an interpretation that would render another regulation superfluous," see United States v. Alisal Water Corp., 431 F.3d 643, 652 (9th Cir. 2005). Here, Schnitzer's proposed interpretation of Rule 2-1-115.1.4.5, if adopted, would render other parts of the Rule superfluous. First, interpreting the Rule as exempting any "storage system" renders superfluous the exemption, set forth in Rule 2-1-115.1.4.4, for "storage silos," as a storage silo is a specific type of storage system.[24] Additionally, Schnitzer's proposed interpretation would render superfluous Rule 2-1-115.1.4.5's inclusion of the phrase "hopper/bin system," which is another specific type of storage system. Consequently, the Court finds stockpiles, such as the NFR stockpiles, are not included within the definition of "storage or weigh hopper/bin system."

In the alternative, Schnitzer argues the NFR stockpiles are exempt under Rule 2-1-128.19, which exempts "[a]ny source or operation deemed by the APCO to be equivalent to a source or operation which is expressly exempted by Sections 2-1-113 through 128." See BAAQMD Rule 2-1-128.19 (emphasis added). There is no evidence in the trial record, however, that the APCO or, for that matter, any BAAQMD official, has

---

[22] Schnitzer does not contend the NFR stockpiles constitute a "storage hopper/bin system."

[23] Rule 2-1-115 has been approved by the EPA as part of the California SIP (see 40 CFR 52.220(c)(502)(i)(A)(1)), and, consequently, is a "federal" regulation. See Safe Air For Everyone, 488 F.3d at 1097.

[24] AIG has offered evidence, undisputed by Schnitzer, that a "storage silo" is "a cylindrical enclosed container" (see Tr. 415:20), i.e., a container used for storage.

United States District Court
Northern District of California

made a finding that NFR stockpiles, or stockpiles in general, are equivalent to one or more of the sources or operations expressly exempted.[25]

Accordingly, AIG is entitled to judgment in its favor on the Fourth Claim for Relief.

## C. Remedies

As noted, AIG seeks injunctive relief and the imposition of civil penalties

### 1. Injunctive Relief

AIG does not, as discussed above, seek injunctive relief with respect to the Third Claim for Relief. As to the Fourth Claim for Relief, however, AIG seeks an order requiring Schnitzer to submit to BAAQMD, and provide a copy to AIG's counsel,[26] an application for a permit to operate the NFR stockpiles, along with a copy of the Court's Findings of Fact and Conclusions of Law, with the "understand[ing]" that, "in processing the application," BAAQMD "will assess for compliance with Rule 2-2-202," i.e., implementation of BACT. (See Pl.'s Proposed Findings at 77:16-18.)

Given the Court's finding that Schnitzer's NFR stockpiles are not exempt under Rule 2-1-115.1.4.5, the Court will order Schnitzer to apply for a permit to operate them. As noted above, however, BAAQMD has the discretion to find said stockpiles to be exempt under Rule 2-1-128.19, and, consequently, the Court will afford Schnitzer the opportunity to file, in connection with such application, an application for a certificate of exemption. Lastly, the Court declines to adopt AIG's proposal that the Court "defer entering further injunctive relief regarding the stockpiles . . . for 90 days after Schnitzer

---

[25] In 2022, BAAQMD staff prepared a "draft analysis" stating that, "[w]hile Section 2-1-115.1.4. does not specifically apply to stockpiles, the [Rule] 2-1-128.19 exemption could apply to stockpiles" (see Ex. 333 at 891), and at trial, Carol Allen, BAAQMD's Manager, Engineering Division, explained said draft was, as appears evident from the document itself, "not complete" (see Tr. 596 at 1-2). Nothing in the instant order is intended to preclude BAAQMD from making a final determination as to the applicability or lack thereof of Rule 2-1-128.19, and, although not in evidence, the Court has been advised that BAAQMD, after the close of evidence, has made such a final determination.

[26] In the event the application contains confidential material, Schnitzer may so designate any such material under the terms of the Stipulated Protective Order filed December 21, 2021.

United States District Court
Northern District of California

United States District Court
Northern District of California

submits [its] application" (see Pl.'s Proposed Findings at 77:18-20), which proposal appears to seek, in the absence of prompt action by BAAQMD, a court order precluding Schnitzer from utilizing the NFR stockpiles until it obtains a permit and implements BACT.[27]

### 2. Penalties

Under § 7604, a court has the power to "apply any appropriate civil penalties," see 42 U.S.C. § 7604(a).  In making such determinations, courts are to consider "the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation," as well as "other factors as justice may require."  See 42 U.S.C. § 7413(e)(1).

With respect to the first two factors, "the size of the business" and "the economic impact of the penalty on the business," see id., although there is no question that Schnitzer is a large corporation, it has in recent years suffered repetitive losses.  In particular, Schnitzer had a significant "net loss" of $25,791,000 in the 2023 fiscal year (see Tr. 977:10-11), and a substantially greater "net loss" of $266,411,000 in the 2024 fiscal year (see Tr. 979:16-18).

Next, the Court considers Schnitzer's "full compliance history and good faith efforts to comply," see 42 U.S.C. § 7413(e)(1), as well as whether a significant penalty is needed to deter violations in the future, see United States v. Vista Paint Corp., 1996 WL 477053, at *11 (C.D. Cal. April 16, 1996) (observing "the major purpose of a civil penalty" is "deterrence") (internal quotation and citation omitted).  As discussed above, one claim

---

[27] Although the above-described 90-day proposal is made without elaboration, the Court's understanding thereof is informed by a similar 90-day proposal made in connection with Schnitzer's operation of the shredder.  (See Pl.'s Proposed Findings at 76:20-22.)

United States District Court
Northern District of California

1    on which AIG has prevailed is the Third Claim for Relief, violation of a permit term.  In

2    that regard, Schnitzer took steps to lower the shredder's POC emissions by applying for

3    an ATC for RTOs even before the date on which it concedes it failed to comply with the

4    condition at issue (see Stipulated Fact No. 11), and it installed the RTOs after it received

5    the necessary approval from BAAQMD, see BAAQMD Rule 2-1-301 (prohibiting

6    installation of device that may "reduce" emissions without first obtaining "written

7    authorization from the APCO").  In light of such expenditure and installation, there is little

8    if any likelihood of a recurrence (see Ex. WW at 1, 9; Ex. AAAA at 1, 7 (results of source

9    tests showing, after installation of RTOs, POC emissions are significantly under limits set

10   in Condition #27085)), thus lessening the need for a high penalty for purposes of

11   deterring Schnitzer from engaging in further violations of POC emission limits.

12       Although not actionable, one other alleged CAA violation established by the

13   evidence is set forth in the First Claim for Relief, namely, Schnitzer's failure to apply for a

14   Title V permit within 12 months of the date on which the Facility became subject to Title

15   V.[28]  There is, however, no evidence to support a finding that Schnitzer was aware, or

16   should have been aware, the Facility was subject to Title V prior to October 2017, after

17   which it promptly advised BAAQMD of its knowledge and thereafter submitted an

18   application for a Title V permit within the time frame BAAQMD had set.  Under such

19   circumstances, the Court finds the Title V violation does not warrant imposition of a high

20   penalty for purposes of deterrence.

21       Turning to the remaining factors, i.e., the duration and seriousness of the violation

22   alleged in the Third Claim for Relief, as well as the economic benefit of noncompliance

23   and any previous penalty, the Court first notes that the factual underpinnings of said

24   violation are, as discussed above, established by the parties' stipulation that, "[b]etween

25   November 1, 2020, and April 2022," the shredder's "daily POC emissions exceeded

26

27       [28] As discussed above, AIG lacks statutory standing to pursue a claim based
     thereon.  The Title V violation, however, constitutes part of Schnitzer's compliance
28   history.

[PTO] Condition #27085 limitations," namely, that the "maximum permitted emission rate of POC (calculated as methane)" was "112.0 pounds per hour and 85.0 tons per year" (see Stipulated Fact Nos. 16, 17), thereby violating the "300 ppm" limit set forth in BAAQMD Rule 8-2-301 (see Tr. at 1068:6-24). Additionally, as noted, the violation ceased after Schnitzer installed RTOs and acid scrubbers in April 2022, and testimony was offered that the annual cost to operate the RTOs is in the range of $3,000,000 to $3,900,000 (see Tr. 786:7-16),[29] which expenses Schnitzer did not have to pay for approximately a year and a half. No other evidence has been submitted as to the circumstances surrounding the violation, nor has AIG suggested the Court should impose any particular penalty for such violation.[30]

The Court observes, however, that Schnitzer has paid to BAAQMD a penalty for an asserted earlier violation of BAAQMD Rule 8-2-301; in particular, Schnitzer, in September 2020, paid BAAQMD a $400,000 penalty imposed under the CAA (see Stipulated Fact Nos. 18-19), for Schnitzer's violation of a different limitation in Condition #27085, namely, that the shredder "not exceed 300 ppmv (dry basis) of total carbon as determined in accordance with [BAAQMD Rule] 8-2-601" (see Ex. 265 at 721-22).[31] BAAQMD's determination that a $400,000 penalty was sufficient for what appears to be a violation similar to the violation on which the Third Claim for Relief is based counsels in favor of imposition of a similar amount in the instant action. Indeed, nothing in the record suggests the permit violation at issue in the instant action is more or less serious than the permit violation pursued by BAAQMD.

---

[29] No testimony was offered as to whether the cost to operate the acid scrubbers is included within said estimates or would be in addition thereto.

[30] AIG does argue that the Court should impose a penalty of $182,960,000, but said figure was based on a proposed finding that AIG would prevail on the entirety of its claims, and appears to be based in large part on AIG's prevailing on the Second Claim for Relief.

[31] BAAQMD Rule 8-2-601 sets forth the alternative methods of measurement for "Determination of Compliance" with Rule 8-2-301.

United States District Court
Northern District of California

1    Accordingly, the Court finds a penalty of $400,000, payable to the United States

2   Treasury, is reasonable.  See 42 U.S.C. § 7604(g)(1).[32]

3                                  **CONCLUSION**

4        For the reasons stated above:

5        1.  AIG is entitled to judgment in its favor on the Third Claim for Relief and on the

6   Fourth Claim for Relief to the extent it is based on NFR stockpiles.

7        2.  Schnitzer is entitled to judgment in its favor on the First Claim for Relief, the

8   Second Claim for Relief, and the Fourth Claim for Relief to the extent it is not based on

9   NFR stockpiles.

10       3.  No later than 90 days from the date of this Order, Schnitzer shall submit to

11   BAAQMD, and provide a copy to AIG's counsel, an application for a permit to operate its

12   NFR stockpiles and, at its election, may at the same time apply for a certificate of

13   exemption; in connection with its submission of its application(s), Schnitzer shall provide

14   BAAQMD with a copy of the instant order.

15       4.  Schnitzer shall pay $400,000 in penalties to the United States Treasury.

16       **IT IS SO ORDERED.**

17

18   Dated:  September 22, 2025

19                                             MAXINE M. CHESNEY
                                               United States District Judge

20

21

22

23

24

25       [32] Although the statute provides a district court with discretion to direct that part of
     the penalty, in an amount no greater than $100,000, be used for "beneficial mitigation
26   projects," see 42 U.S.C. § 7604(g)(2), the Court declines to make such an order in the
     instant case.  The need to mitigate any harm caused by releases of LFM into the nearby
27   community is already being addressed by the terms of a consent order filed in a state
     court action brought by the State of California against Schnitzer, which terms the State is
28   actively enforcing.  (See Ex. TX130, TX185 at 539, 541.)

United States District Court
Northern District of California